**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| INDIGENOUS PEOPLES OF THE COASTAL BEND; KARANKAWA KADLA TRIBE OF THE TEXAS GULF COAST; and INGLESIDE ON THE BAY COASTAL WATCH ASSOCIATION, | § § § § § § § § | |
| *Plaintiffs,* | § | |
| v. | § § | CIVIL ACTION NO. 21-161 |
| UNITED STATES ARMY CORPS OF ENGINEERS; LIEUTENANT GENERAL SCOTT A. SPELLMON in his official capacity; BRIGADIER GENERAL CHRISTOPHER G. BECK in his official capacity; and COLONEL TIMOTHY R. VAIL in his official capacity, | § § § § § § § § § § | |
| *Defendants.* | | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Come Now Indigenous Peoples of the Coastal Bend, Karankawa Kadla Tribe of the Texas Gulf Coast, and Ingleside on the Bay Coastal Watch Association (collectively, "Plaintiffs"), challenging decisions by the United States Army Corps of Engineers ("Corps of Engineers" or "Corps") in connection with the proposed expansion of Moda Ingleside Oil Terminal in San Patricio County, Texas. For support, Plaintiffs offer the following:

# I.    INTRODUCTION

1.    This is a civil action brought by Indigenous Peoples of the Coastal Bend, the Karankawa Kadla Tribe of the Texas Gulf Coast, and Ingleside on the Bay Coastal Watch Association for declaratory, injunctive, and other relief pursuant to the provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706; the Clean Water Act ("CWA"), 33 U.S.C. § 1344; and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and its implementing regulations.

2.    This litigation arises from the decision by the United States Army Corps of Engineers to issue a Clean Water Act Section 404 permit to Moda Ingleside Oil Terminal, LLC for the proposed expansion of the Moda Ingleside Energy Center ("Moda Terminal") in the Corpus Christi Ship Channel, in San Patricio County, Texas.

3.    The Moda Terminal is located near the Gulf of Mexico, where the Corpus Christi Ship Channel meets the La Quinta Ship Channel, immediately to the east of City of Ingleside on the Bay. The Moda Terminal is the largest export terminal in the United States by volume by a considerable margin, with exports averaging about 780 thousand barrels per day over the 14-month period since January 2020, or about 24% of total U.S. crude oil exports.[1] The proposed westward expansion of the Moda Terminal would add five additional berths for oil tankers and barges, and essentially double its vessel capacity.

---

[1] Housely Carr, *Leaders Of The Pack - Three Gulf Coast Crude Oil Export Terminals Winning Battle for Barrels*, RBN Energy LLC (Mar. 2, 2021), https://rbnenergy.com/leaders-of-the-pack-three-gulf-coast-crude-oil-export-terminals-winning-battle-for-barrels ("[The Enterprise Hydrocarbon Terminal in Houston] is in the runner-up spot, with volumes averaging more than 420 Mb/d . . . or 13% of the total.")

4. On April 28, 2021, the Corps granted Moda's request for a Clean Water Act Section 404 permit, authorizing Moda to dredge approximately 3.9 million cubic yards of material out of the Corpus Christi Bay in order to increase its terminal's footprint—the overall dredge footprint will be approximately 43 acres.

5. The construction and operation of the Moda Terminal expansion will have significant impacts on the environment, the surrounding community, and the public interest, as detailed more fully below. Surveys conducted by Moda, for instance, demonstrate this project would have a significant impact on approximately 9.81 acres of diverse seagrasses and estuarine wetlands.

6. Plaintiffs Indigenous Peoples of the Coastal Bend, the Karankawa Kadla Tribe of the Texas Gulf Coast, and Ingleside on the Bay Coastal Watch Association have filed this Complaint because the Corps' issuance of the 404 Permit to Moda authorizing the proposed terminal expansion violates the CWA, NEPA, and the federal APA in critical respects. These violations directly harm Plaintiffs and the members of the plaintiff organizations.

## II.    JURISDICTION

7. Plaintiffs state these claims under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.  This Court has jurisdiction over the claims set forth in this Complaint pursuant to 28 U.S.C. § 1331 (federal question) and 1346 (United States as defendant). The relief sought is authorized by 28 U.S.C. §§ 2201(a) and 2202, and 5 U.S.C. § 706.

### III.    VENUE

8.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (e), because the property where the proposed Moda Terminal expansion is to be located, which is the subject of the action, is situated within the Corpus Christi Division of the Southern District of Texas.

### IV.    PARTIES

**A.    <u>Plaintiffs</u>**

9.    Plaintiff **Indigenous Peoples of the Coastal Bend** ("Indigenous Peoples") is a nonprofit, membership-based organization with approximately 50 members. Indigenous Peoples is based in Corpus Christi. As a part of its mission, Indigenous Peoples works to preserve and protect the history and the natural and cultural resources of indigenous people who have lived and continue to live in the geographical region known as the Texas Coastal Bend, particularly in Aransas, Bee, Brooks, Jim Wells, Kenedy, Kleberg, Nueces, Refugio, and San Patricio Counties. Indigenous Peoples is also dedicated to educating and advocating on behalf of its members and local indigenous people on issues related to protection of the natural environment and places of cultural significance, indigenous rights and justice, and indigenous culture and education. Indigenous Peoples' members are descendants of various indigenous groups from the Texas Coastal Bend area, including the Karankawa Kadla tribe.

10.    Plaintiff **Karankawa Kadla Tribe of the Texas Gulf Coast** ("Karankawa Kadla tribe") is a tribe whose members are indigenous to the Texas Coastal Bend. The Karankawa Kadla tribe has approximately 300 identified members at this time, and

though many more exist, it is not possible to know how many, because the tribe's ancestors were disbanded with other tribes throughout the region and there was an intentional effort to see the history systematically erased.

11.     Members of the Indigenous Peoples and of the Karankawa Kadla tribe travel regularly to Ingleside on the Bay in San Patricio County, Texas to enjoy the natural beauty of the land and the ocean, to observe wildlife in the area, and to find spiritual joy and fulfillment through their connections to the land, water, wildlife, and their ancestors who lived in the area. Members of the Indigenous Peoples and of the Karankawa Kadla tribe consider the land and adjacent waters where the proposed Moda Terminal expansion would be built as sacred, because of its link to the members' ancestors, who lived in the area for hundreds of years.

12.     The McGloin's Bluff Site, for example, and the surrounding area is well known as the former site of a large Karankawa encampment. The encampment was where ceremonial dances and other significant rituals took place. Tens of thousands of artifacts have been found in and around the McGloin's Bluff Site, including pottery fragments, arrow points, tools, and fish and animal bones. The size of the Karankawa encampment in the area was substantially larger than the small area (Archaeological Site 41SP11) that has been studied at the McGloin's Bluff Site. There is reason to believe that there are more artifacts to be found in the area.

13.     Though the eastern part of Moda's property, where the existing Moda facility sits, was also part of the Karankawa encampment, that area has been significantly developed already. The western 432 acres of the Moda property around McGloin's Bluff,

including the coastline and bay, has not been developed. This undeveloped space between the Moda facility and Ingleside on the Bay is the only remaining undeveloped area in this part of the Bay. This undeveloped space represents the last remaining vestige of the landscape and ecosystems that once occupied the area.

14.     Indigenous Peoples and the Karankawa Kadla tribe both have members who regularly visit property near the McGloin Bluff Site in order to observe the natural beauty of the undisturbed landscape, shoreline, and water that is the location of the proposed Moda expansion. Indigenous Peoples' members and the Karankawa Kadla tribe's members use and enjoy these areas to observe the natural beauty of the land, the water, and the wildlife, and members intend to continue to use and enjoy these areas in the near future. Members are culturally and spiritually connected to the McGloin Bluff Site, the surrounding land, coastline, and coastal water, given what they know of its history and that it currently remains undeveloped.

15.     Indigenous Peoples' members and the Karankawa Kadla tribe's members are concerned that the dredging of the Corpus Christi Bay will harm the natural ecosystem and destroy habitat that attracts wildlife. They are concerned that the dredging will destroy ancestral artifacts and thwart their efforts to learn more about their people's history and culture, and that the expansion of the Moda Terminal will destroy the McGloin's Bluff site and the surrounding area. The increase in ship traffic and the associated increase in noise, industrial activity, and pollution will destroy their ability to pray and find spiritual joy and fulfillment in observing their ancestral lands and waters.

16.    For example, one member of Indigenous Peoples regularly travels to Ingleside on the Bay with other members of the organization to observe the natural beauty of the land of McGloin's Bluff and the nearby coastline. Specifically, she participates in spiritual ceremonies and traditional drum circles in the open area immediately adjacent to Moda's fenceline and on the nearby beach. From time to time, she has also taken a boat to the barrier island immediately off the coast of Ingleside on the Bay. From both places, she enjoys the view of the McGloin Bluff area and watching the sparkling waters of the ocean and wildlife moving around the area, particularly dolphins and hawks, which are considered signs of approval from her ancestors. She intends to visit the area again every month, but she worries that the Moda expansion and the increased ship traffic and noise will threaten the natural beauty of the area and diminish her ability to use the area for spiritual ceremonies and drumming and harm her ability to find spiritual joy and meaning at the site of her ancestors' land.

17.    At least one member of the Karankawa Kadla tribe visits the area near McGloin's Bluff regularly. He has visited the area at least once per year since he was a child to pray with other members of the tribe. The area has changed and been developed since he was young, and he now visits the open area and beach directly west of the Moda fence line. In the past year, he has gone to this specific area to pray approximately four times, and has also gone on boat trips to the barrier island with members of the Indigenous Peoples. He has plans to continue to visit the area at least as regularly, if not more so, so that he can observe the land and water in the same area where his ancestors did and sit in silent prayer to them. He is concerned that the Moda expansion would harm

7

his ability to find a peaceful place to pray, and that the increase in ship traffic, noise, and industrial activity would harm his ability to pray in silence. He is also concerned that the environmental damage that would be caused by the Moda expansion and increased industrial activity in the water would harm the marine life, the animals, the plants, and the quality of the water and diminish his enjoyment of visiting the sacred ancestral site.

18.    Plaintiff **Ingleside on the Bay Coastal Watch Association, Inc.** ("IOBCWA") is a Texas-based nonprofit membership organization, based in Ingleside on the Bay, San Patricio County, Texas.

19.    Founded in 2019, IOBCWA's mission is "to preserve our community's high quality of life by developing strategic partnerships, fostering innovative approaches, and pursuing funding designed to position IOB [Ingleside on the Bay] as a resilient coastal community able to mitigate the negative effects of rising sea levels, larger and more frequent ship traffic, and rapid industrialization."

20.    IOBCWA currently has over 130 members. Among its members is Patrick Nye, who co-founded the organization. Mr. Nye owns property and resides in Ingleside on the Bay, a small city on the north shore of the Corpus Christi Bay. The Moda Terminal property line is 810 feet from his house. Mr. Nye has built his life and his family's life around recreation on this land and the waters of Corpus Christi Bay. He boats, kayaks, fishes, and crabs on the waters of the Bay. He experiences constant industrial noise from the Moda facility, light pollution at night, and odors from emissions. He observes frequent plumes of silt which come from docking operations, impairing the

8

water quality in front of his house. The failure to meet the requirements of federal statutes protecting natural resources and the public directly harms Mr. Nye.

21.     Plaintiffs and their members have an interest in ensuring Moda's activities do not further harm the environment, pursuant to the Clean Water Act, and that a comprehensive environmental analysis, pursuant to NEPA is prepared. Plaintiff IOBCWA participated in the comment process for the Moda Terminal expansion, and brought the issues in this matter to the attention of the Corps of Engineers.

22.     Plaintiffs and their members are suffering, and will continue to suffer, irreparable injury as a result of the Corps' failure to comply with the Clean Water Act and NEPA. The Corps' approval of the Section 404 Permit is based on an inadequate environmental review and the Corps' failure to follow requisite procedures deprives Plaintiffs and their members of information to which they are entitled under NEPA.

### B.    Defendants

23.     Defendant **United States Army Corps of Engineers** is an agency within the executive branch of the federal government. It is the lead agency charged with permitting the discharge of dredged or fill material into waters of the United States under the Clean Water Act. The Corps is responsible for ensuring compliance with various statutes, including the National Environmental Policy Act, for its permitting and authorization decisions.

24.     The Corps is headquartered in Washington, D.C. and has district offices all over the country. The Corps may be served at 441 G Street NW, Washington, D.C. 20314.

25.    Defendant **Lieutenant General Scott A. Spellmon** is the Chief of Engineers and Commanding General of the United States Army Corps of Engineers and is designated to act for the Secretary of the Army. Plaintiffs bring this action against Lt. Gen. Spellmon in his official capacity only. He is the officer personally responsible for compliance with any injunction ordered upon the Corps that this Court issues.

26.    Defendant **Brigadier General Christopher G. Beck** is the Commander of the Southwestern Division of the United States Army Corps of Engineers. Plaintiffs bring this action against Brig. Gen. Beck in his official capacity only. The Southwestern Division office is located at 1100 Commerce Street, Suite 831, Dallas, Texas 75242.

27.    Defendant **Colonel Timothy R. Vail** is the Commander of the Galveston District of the United States Army Corps of Engineers. Plaintiffs bring this action against Col. Vail in his official capacity only. The Galveston District office is located at 2000 Fort Point Road, Galveston, Texas 77550.

## V.    RELEVANT LEGAL AUTHORITY

### A.    National Environmental Policy Act

28.    NEPA, 42 U.S.C. §§ 4321–4370m, is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (2019).[2] It makes environmental

---

[2] After the Permit application was submitted, the Council on Environmental Quality (CEQ) revised its regulations implementing NEPA. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020). This Complaint cites to the prior regulations, which were in effect during most of the environmental review process for the Moda Terminal expansion, including both of the Corps' public comment periods, and therefore apply here. The new regulations are also already subject to four lawsuits. *See* Compl. for Declaratory and Injunctive Relief, *California v. Council on Env't Quality*, No. 3:20-cv-06057 (N.D. Cal. Aug. 28, 2020); Compl., *Env't Just. Health All. v. Council on Env't Quality*, No. 1:20-cv-06143 (S.D.N.Y. Aug. 6, 2020); Compl., *Wild Va. v. Council on Env't Quality*, No. 3:20-cv-00045 (W.D. Va. July 29, 2020); Compl. for Declaratory and Injunctive Relief, *Alaska Cmty. Action on Toxics v. Council on Env't Quality*, No. 3:20-

protection part of the mandate of every federal agency, 42 U.S.C. § 4331, and requires federal agencies to take environmental considerations and "any irreversible and irretrievable commitments of resources" into account in their decisionmaking "to the fullest extent possible," *id*. § 4332; 40 C.F.R. § 1500.2 (2019).

29.    NEPA seeks to ensure that federal agencies take a "hard look" at environmental consequences before taking a major action. *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1128 (8th Cir. 1999). One of NEPA's primary purposes is to ensure that an agency, "in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA also "guarantees that the relevant information [concerning environmental impacts] will be made available to the larger audience," including the general public, "that may also play a role in both the decisionmaking process and the implementation of that decision." *Id*.

30.    NEPA requires federal agencies to fully disclose in "every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement" on, among other things, "the environmental impact of the proposed action" and "any adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(C). This statement is referred to as an Environmental Impact Statement ("EIS").

---

cv-05199 (N.D. Cal. July 29, 2020). Moreover, without express statutory authority to the contrary, rules do not apply retroactively. *Bowen v. Georgetown Univ. Hosp*., 488 U.S. 204 (1988).

31.    The EIS must describe (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) any "alternatives to the proposed action," and (4) any "irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented." *Id*.

32.    NEPA also requires agencies to use high quality, accurate scientific information and to ensure the scientific integrity of the analysis. 40 C.F.R. §§ 1500.1(b) (2019), 1502.24 (2019).

33.    Major federal actions include "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies," 40 C.F.R. § 1508.18(a) (2019), and "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities." *Id.* § 1508.18(b)(4) (2019). The word "major" "reinforces but does not have a meaning independent of significantly." *Id*. § 1508.18 (2019).

34.    If it is unclear whether impacts are significant enough to warrant an EIS, a federal agency may prepare an "environmental assessment" ("EA") to assist in making that determination. *Id*. §§ 1501.3 (2019), 1508.9 (2019). If the agency determines that no EIS is required, it must document that finding in a "finding of no significant impact" ("FONSI"). *Id*. § 1508.13 (2019).

35.     When a project cannot go forward without a permit, then the environmental impacts of the entire project must be reviewed under NEPA. *White Tanks Concerned Citizens, Inc. v. Strock*, 563 F.3d 1033, 1039–40 (9th Cir. 2009); *see also* 33 C.F.R. Pt. 325, App. B §§ 7(b)(1), 7(b)(2)(A).

36.     If the agency concludes in an EA that a project may have significant impacts on the environment, then an EIS must be prepared. 40 C.F.R. § 1501.4 (2019).

37.     To determine whether a proposed action may significantly affect the environment, the agency must consider both the context (i.e., the import of the action on society, the regions or localities affected, and the interests affected by the action) and intensity (i.e., the "severity of impact") of the proposed action, including whether the project will take place in "ecologically critical areas" and whether the project will affect endangered species. *Id*. § 1508.27 (2019).

38.     With respect to the latter, the regulations lay out ten factors that are to be considered. Examples of these criteria include the degree to which: the proposed action affects public health or safety; the possible effects on the human environment are likely to be highly controversial; the possible effects on the human environment are highly uncertain or involve unique or unknown risks; the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration; the action is related to other actions with individually insignificant but cumulatively significant impacts; and the action may adversely affect an endangered or threatened species or its habitat. *Id*.

39.     An EIS must include a "range of actions, alternatives, and impacts." 40 C.F.R. § 1508.25 (2019). For example, an agency must consider direct and indirect impacts, or effects, of an action when determining the scope of an EIS. *Id.* § 1508.25(c)(1)–(2) (2019). The direct effects of an action are those effects "which are caused by the action and occur at the same time and place." *Id.* § 1508.8(a) (2019). The indirect effects of an action are those effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b) (2019).

40.     An agency also must analyze and address the cumulative impacts of a proposed project. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976); 40 C.F.R. §§ 1508.7 (2019), 1508.25(c)(3) (2019). Cumulative impacts are the result of any past, present, or reasonably foreseeable future actions, regardless of who takes them. Such effects "can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7 (2019).

41.     "[A] meaningful cumulative impact analysis must identify (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate." *Del. Riverkeeper Network v. Fed. Energy Regul. Comm'n*, 753 F.3d 1304, 1319 (D.C. Cir. 2014) (quoting *Grand Canyon Trust v. F.A.A.*, 290 F.3d 339, 345 (D.C. Cir. 2002)).

14

42.    Cumulative impact analyses are insufficient when they discuss only the direct effects of the project at issue on a small area and merely contemplate other projects but have no quantified assessment of their combined impacts. *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 872 (9th Cir. 2020).

43.    "The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 508 F.3d 508, 550 (9th Cir. 2007).

44.    NEPA calls for a quantification of the incremental impacts that the proposed project's emissions will have on climate change or on the environment more generally in light of other past, present, and reasonably foreseeable actions. *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1216 (9th Cir. 2008). NEPA requires analysis of the "actual environmental effects resulting from those emissions." *Id.*

45.    NEPA requires consideration of separate components of a single project in a single NEPA review. 40 C.F.R. § 1508.25 (2019). NEPA regulations state that connected actions should be considered in a single EIS, defining them as actions that "cannot or will not proceed unless other actions are taken previously or simultaneously," and "are interdependent parts of a larger action and depend on the larger action for their justification." *Id.*

46.    NEPA requires federal agencies to analyze "both the probability of a given harm occurring and the consequences of that harm if it does occur." *New York v. Nuclear Regul. Comm'n*, 681 F.3d 471, 482 (D.C. Cir. 2012).

47.    Agencies cannot avoid their responsibility to consider future effects by claiming they are uncertain, because NEPA requires some element of predictive behavior. *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1078–79 (9th Cir. 2011); *see also* 40 C.F.R. § 1502.22 (2019).

48.    Federal courts have found that NEPA requires analysis of the risk that an oil spill will occur and an assessment of the potential impacts of a spill on particular resources and into Corps' jurisdictional waterways. *See, e.g., Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 867–68 (9th Cir. 2005) (Corps was required to analyze effects of increased tanker traffic, and attendant risks of oil spills, before issuing Section 404 permit for dock extension); *Sierra Club v. Sigler*, 695 F.2d 957, 968–75 (5th Cir. 1983) (Corps violated NEPA in issuing a permit for a dredging project by failing to analyze worst-case scenario of oil tanker spill); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 133–34 (D.D.C. 2017) (EA inadequate because it did not describe the potential impacts of an oil spill on specific tribal hunting and fishing rights).

49.    In addition, NEPA mandates that agencies analyze cultural resource impacts in environmental impact statements. 40 C.F.R. §§ 1502.16(g) (2019), 1508.8 (2019).

16

50.    "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id*. § 1500.1(b) (2019). Agencies are required to make environmental documents, including environmental assessments and findings of no significant impact, available to the public. *Id*. §§ 1501.4(e)(1) (2019), 1506.6(b) (2019), 1508.10 (2019).

51.    An agency's failure to include and analyze information that is important, significant, or essential renders an EA and FONSI inadequate. *See id*. § 1500.1 (2019).

52.    The Corps' regulations incorporate these requirements by reference. 33 C.F.R. Pt. 325, App. B § 2.

53.    The Corps' regulations explain that the scope of a NEPA analysis includes the impacts of the specific activity requiring a Corps permit and "those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review." *Id*., App. B § 7(b)(1).

54.    The Corps' regulations provide that the NEPA analysis should include direct, indirect, and cumulative impacts. *Id*., App. B § 7(b)(3).

55.    The Corps' regulations further state: "In all cases, the scope of analysis used for analyzing both impacts and alternatives should be the same scope of analysis used for analyzing the benefits of a proposal." *Id*.

### B.    The Clean Water Act

56.    Congress enacted the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101(a), 33 U.S.C. § 1251(a).

57.    The Clean Water Act also established, as part of the Corps' water resources development program, the long-term goal "to increase the quality and quantity of the Nation's wetlands." 33 U.S.C. § 2317(a)(1).

58.    To accomplish these goals, the Clean Water Act prohibits the discharge of dredged and fill materials into "waters of the United States" absent a permit issued by the Corps under CWA § 404. Unless statutorily exempt, all discharges of dredged or fill material into waters of the United States must be authorized under a permit issued by the Corps. *Id.* §§ 1344(a)–(e).

59.    The Corps issues individual permits under CWA § 404(a) on a case-by-case basis after taking "all appropriate and practicable steps to avoid and minimize adverse impacts to waters of the United States." 40 C.F.R. § 230.91(c)(2); *see* 33 U.S.C. § 1344(a). Such permits are issued after a review involving, among other things, site-specific documentation and analysis of waters and wetlands and potential effects to them, public interest analysis, and a formal determination pursuant to the statutory and regulatory criteria. *See* 33 C.F.R. § 322.3 and Parts 323, 325.

60.    Under the Clean Water Act, there are strict substantive limits on approving projects that degrade water quality or harm aquatic uses.

61.    First, the Corps may not issue a permit under Section 404 if there is a "practicable alternative" to the project with less impact on the aquatic ecosystem. 40 C.F.R. § 230.10(a). The Corps is required to conduct an alternatives analysis. The process for undertaking this analysis is set out in the guidelines implementing CWA § 404. The Corps must define the project's "overall project purposes." *Id.*

18

62.     The Corps cannot arbitrarily restrict the range of viable alternatives by adopting an overly narrow definition of the project's purposes. *Friends of the Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 912 (9th Cir. 2018); *Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs*, 869 F.3d 148, 157 (3d Cir. 2017).

63.     Cost alone is not sufficient to show that an alternative is not practicable. *Del. Riverkeeper Network*, 869 F.3d at 159–60.

64.     Second, the Corps cannot issue the permit unless there is a demonstration that any discharge from the project "will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern," 40 C.F.R. § 230.1(c). The Corps also may not issue the permit if it will result in a discharge that "will cause or contribute to significant degradation of the waters of the United States," *id*. § 230.10(c).

65.     Where no less damaging, practicable alternative is available, the applicant must show that all "appropriate and practicable steps" will be taken to "minimize potential adverse impacts of the discharge on the aquatic ecosystem." *Id*. § 230.10(d).

66.     Moreover, the Corps must independently verify all the information in the permit application. *See, e.g., Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1269 (10th Cir. 2004); *see also* 40 C.F.R. § 1506.5(a).

## C.    Corps' Permitting Regulations

67.     Before issuing any CWA permit, the Corps must determine that the project is in the "public interest" by weighing all "relevant" considerations and balancing all probable impacts of the proposed action against its alleged benefits. 33 C.F.R. § 320.4(a).

19

68.    The Corps must base its decision to issue a permit on "an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." *Id*. § 320.4(a)(1).

69.    The Corps must balance "the benefits which reasonably may be expected to accrue from the proposal" against "its reasonably foreseeable detriments." *Id*.

70.    Full evaluation of the general public interest requires that the Corps give due consideration to the effect of the proposed action on historic, cultural, scenic, and recreational values, including Indian religious or cultural sites. *Id*. § 320.4(e).

71.    The District Engineer is authorized to make an "independent review of the need for the project from the perspective of the overall public interest." *Id*. § 320.4(q).

72.    Consistent with NEPA, *see* 40 C.F.R. §§ 1500.1(b) (2019), 1502.24 (2019), the Corps must independently verify the information submitted by the permit applicant. *Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1265–68 (S.D. Fla. 2009).

## VI.    FACTUAL ALLEGATIONS

73.    On January 10, 2020, Moda submitted to the Corps a permit application under Section 404 of the CWA to conduct activities, including dredging of approximately 3,900,000 cubic yards across an approximate 43-acre dredge footprint, as part of its planned expansion of the West Ship Basin and other improvements at the existing East Basin site.

74.    Moda subsequently withdrew its application, as advised by the Corps, to allow for additional data collection.

20

75.    On September 11, 2020, Moda sought to reinstate its permit application, with a revised alternatives analysis and mitigation plan. The Alternatives Analysis was revised, at least in part, in response to comments by the U.S. Fish and Wildlife Service, EPA, TCEQ, and Texas Parks and Wildlife Department.

76.    The Moda Terminal currently has three deepwater vessel berths.

77.    The project proposes to increase the width of the West Ship Basin from 390 feet wide to 475 feet to allow construction of new barge docks: Berths 7A, 7B, 7C, 8, and 9, add a 1700-foot-diameter turning basin at the West Ship Basin entrance to the Corpus Christi Ship Channel, and add a new deep-water ship dock in the West Ship Basin. The project would also expand existing Berth 2A.

78.    The Berth 7 docking area would allow for up to three double barges to dock side by side (Berths 7A, 7B, and 7C).

79.    Berths 8 and 9—the new deep-water ship dock—would accommodate docking of two Suezmax vessels (Berths 8 and 9).

80.    Expansion of the West Ship Basin, as proposed, would require dredging of approximately 3,900,000 cubic yards of material. Near proposed Berth 7A, Moda would dredge the existing bay bottom to a depth of -15 feet mean lower low water (MLLW). In the remainder of the West Basin expansion, near proposed Berths 7B, 7C, 8, and 9, Moda would dredge the existing bay bottom to a depth of -54 feet MLLW.



Existing Berth Layout                    Proposed Berth Layout

*Source: Moda's 12-Step Mitigation Plan, Revised March 29, 2021, incorporated into Moda's 404 Permit.*

81.    The Corps prepared and issued an Environmental Assessment and Statement of Findings on April 2, 2021 ("EA"), and on April 28, 2021, the Corps issued Moda its requested permit, authorizing the expansion of the West Ship Basin and the improvements to the existing East Ship Basin as proposed by Moda.

82.    The basic and overall project purpose, as defined by the Corps in its Environmental Assessment and Statement of Findings, is "to dredge additional bay area and construct mooring structures to provide adequate depth and area for the berthing of deeper-draft ships that will be used to transport *liquefied natural gas*." (Emphasis added.) The Moda Terminal does not export liquefied natural gas, and Moda's permit application contains no discussion of liquified natural gas.

83.    This project has been a controversial one, opposed by many because of the significant environmental and cultural impacts, as evidenced by the numerous comments submitted by members of the public, federal and state agencies, and impacted organizations, including the Plaintiffs in this matter.

22

84.     For instance, representatives of the Texas Parks and Wildlife Department and the U.S. Fish and Wildlife Service ("USFWS") were particularly concerned with the identification and avoidance of seagrass and emergent wetlands. The EA acknowledges that seagrasses and emergent wetlands will be impacted, but provides a paltry explanation of efforts made by Moda to minimize those impacts, as required by law.

85.     In addition, cultural and historic resources of the Karankawa make the area unique and eligible for listing in the National Register of Historic Places. The area is a documented archaeological site, and archaeologists have found abundant artifacts from Karankawa culture, including tens of thousands of pottery shards, tools, and fish and animal bones. Archaeological reports also state that the area is eligible for listing on the National Register of Historic Places.

86.     The artifacts found at the McGloin's Bluff Site represent the history of the Karankawa people, the Native Americans known to inhabit the area at the time of colonization. The McGloin's Bluff area was probably used by the Karankawa during the fall, winter and early spring when coastal fish would spawn in Corpus Christi Bay, and archaeological findings suggest that the site was the focal point for generating the surplus fish supply in the region. The area is deeply valued by the living members of the Karankawa tribe as a key location representative of their cultural history.  The historic and ecological value of the area is known to the general public, and longtime residents report productive fishing and finding artifacts at the site.

87.    Yet, remarkably, the Corps failed to include the Karankawa tribe, or any local indigenous group, as a consulting party in its assessment. *See* 36 C.F.R. § 800.2(c)(5).

88.    Nor did the area of the Corps' analysis include sufficient exploration of the upland areas of McGloin's Bluff.

89.    In response to comments from the Karankawa and other interested parties about impacts to the McGloin's Bluff area, the Corps responded, dismissively, that "none of the applicant's proposed plans show any work in the adjacent uplands that were the object of these commenters' concern."

90.    By this litigation, Plaintiffs contend that Defendant violated NEPA and CWA statutory and regulatory requirements, and their final decision was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, per the APA.

## VII.    CAUSES OF ACTION

91.    The facts set forth in the preceding paragraphs are adopted herein.

### Claim for Relief No. 1:

**The Corps' failure to prepare an EIS violated NEPA, CWA, and the APA.**

92.    The Corps' issuance of the requested permit to Moda, authorizing dredging activities under CWA Section 404 and expansion of the Moda Terminal, was a major federal action that required compliance with NEPA.

93.    Although the Moda permit application does not contain certain critical information, such as the number of tankers and other vessels that will use the terminal, it

24

is clear that the expansion will essentially double the size of the terminal's docking facilities. The Corps' issuance of the CWA 404 permit will result in significant operational changes at the Moda Terminal, a substantial increase in the size of the facility, and significant impacts to the environment.

94.     Among those impacts are the risk of oil spills and accidents, direct and indirect impacts to seagrasses and the marine life that depend on them, impacts to cultural resources, light pollution, noise pollution, erosion, and air emissions.

95.     NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4. "In reviewing an agency's decision not to prepare an EIS, the arbitrary and capricious standard under the APA requires a court to determine whether the agency has taken a 'hard look' at the consequences of its actions, based its decision on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant." *Montana Env't Info. Ctr. v. U.S. Off. of Surface Mining*, 274 F. Supp. 3d 1074, 1099 (D. Mont. 2017) (quoting *Barnes v. U.S. Dept. of Transp.*, 655 F.3d 1124, 1132 (9th Cir. 2011)).

96.     The statement of reasons must address significance in terms of "context" and "intensity" of the proposed action. 40 C.F.R. § 1508.27. Context "means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." *Id*. § 1508.27(a). Intensity "refers to the severity of impact," and involves an analysis of ten significance factors, including, inter alia, the degree to which the action affects public

health or safety; unique characteristics of the geographic area such as proximity to historic or cultural resources, wetlands, or ecologically critical areas; the degree to which the effects are likely to be highly controversial; the degree to which the action may adversely affect objects eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources. *Id*. § 1508.27(b).

97.    The Corps regulations explain that actions normally requiring an EIS include: proposed changes in projects that increase size substantially or add additional purposes and proposed major changes in the operation and/or maintenance of completed projects. 33 C.F.R. § 230.6(b) & (c).

98.    District commanders may consider the use of an environmental assessment on these types of actions if early studies and coordination show that a particular action is not likely to have a significant impact on the quality of the human environment. *Id.*

99.    Here, the Corps was required to prepare an EIS pursuant to NEPA and the Corps' implementing regulations. The Moda Terminal expansion project met both of the standards described above. The Moda Terminal expansion project proposes changes that "increase size substantially or add additional purposes" and propose "major changes in the operation" of the oil export terminal.

100.    The Moda Terminal is already the largest export terminal in the U.S. Gulf Coast, and this expansion will more than double its vessel capacity and significantly increase its oil exportation output.

101.    As stated above, Moda intends to dredge approximately 3.9 million cubic yards of material out of the bay with an overall dredge footprint of approximately 43 acres.

102.    These activities are predicted to have a significant impact on seagrasses and wetlands.

103.    As stated in the CWA 404(b)(1) guidelines: "From a national perspective, the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts covered by these Guidelines. The guiding principle should be that degradation or destruction of special sites may represent an irreversible loss of valuable aquatic resources." 40 C.F.R. § 230.1(d).

104.    The expansion project will also result in major changes in the operation of the existing Moda Terminal. Moda intends to vastly increase the capabilities at its Terminal with the express intention of handling the alleged major increase in crude oil exportation from supertankers. As stated by Moda, the asserted purpose of the expansion project is to meet the "increased export demands" of crude oil and "accommodate the additional and larger vessels beginning to call at U.S. ports."

105.    The Corps had a duty under NEPA to thoroughly analyze the impacts of the Moda Terminal expansion. In its decision to not prepare an EIS, the Corps was required to provide a "convincing statement of reasons to explain why the project's impacts are insignificant." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998). It completely failed its duty. Instead, in its response to requests for an

EIS, the Corps simply deferred to Moda and concluded: "The proposed project is not considered a major federal action and only includes improvements to an existing industrial site." Improvements to an existing industrial site fit squarely within its parameters to produce an EIS. *See* 33 C.F.R. § 230.6.

106.   By issuing an inadequate EA instead of preparing an EIS, the Corps' actions were arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of NEPA, 42 U.S.C. § 4332, and the APA, 5 U.S.C. §§ 701-706.

## Claim for Relief No. 2:

**The Corps' failure to adequately consider the impacts of its permitting decision violated NEPA, CWA, and the APA.**

107.   The Corps arbitrarily and insufficiently analyzed the environmental impacts of its approval for the oil export expansion project and failed to comply with its mandates under NEPA. The Corps' EA for the project inadequately examined multiple environmental effects, including impacts to conservation, special aquatic sites, economy, cultural and historic resources, oil spill risks, and aesthetics. This failure is in part due to the fact that the Moda permit application contained no information, and the Corps sought no information, about critical areas, such as the number of tankers and other vessels that would use the expanded terminal.

108.   A federal agency must take a "hard look" and ensure that "the adverse environmental effects of the proposed action are adequately identified and evaluated." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); 42 U.S.C. § 4332(2)(C). This "ensures that important effects will not be overlooked or underestimated

only to be discovered after resources have been committed or the die otherwise cast." *Robertson*, 490 U.S. at 349. Effects include both beneficial and detrimental effects and may "include ecological . . . , aesthetic, historic, cultural, economic. . . , social, or health effects." 40 C.F.R. § 1508.8.

109.   "When a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered." *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 986–87 (8th Cir. 2011) (citing *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir.1989)). "NEPA was designed to prevent the real environmental harm that could occur through inadequate foresight and deliberation, especially in light of the difficulty of stopping a bureaucratic steam roller, once started." *Id*. at 987.

110.   The Corps failed to take a hard look and underestimated impacts to seagrass, a special aquatic site protected under the CWA.

111.   The Corps takes at face value that the amount of seagrass that will be impacted by the project is only the seagrass that will be directly dredged.  There is no analysis or investigation into the impacts to seagrass caused by turbidity and loss of sunlight resulting from vessel and terminal operations. The Corps imposes no special conditions to ensure minimization of impacts on either seagrass and wetlands.

112.   Plaintiff IOBCWA informed the Corps of scientific data that indicated the extent of seagrass degradation would be far greater than what was reported by Moda. It explained further that impacts may be more than four times the size of the area permitted due to prop wash plumes from vessels causing degraded sunlight conditions.

113.    In a subsequent letter to the Corps, IOBCWA explained that "[a]fter an extended period of study, the data now reveals that docking operations in MODA's west basin are directly correlated to an increase in bay water turbidity and loss of sunlight."

114.    In its comments to the Corps, the Texas Parks and Wildlife Department stressed that the "continuous and diverse aquatic bed" to be impacted was similar to seagrass beds in Redfish Bay, a designated State Scientific Area, about 1.5 miles away.

115.    USFWS also requested the applicant evaluate and develop a plan to protect area seagrass beds immediately adjacent to the basins and along the east and west of the approach from vessel wakes.

116.    The Corps, however, failed to seriously consider this information, and in its EA the Corps repeated without further analysis a statement from Moda that "[t]he existing seagrass beds have persisted for decades adjacent to the existing site which includes regular nearby vessel traffic, including that from within the adjacent CCSC."

117.    The Corps had a duty in its EA to evaluate and incorporate harms to seagrass caused beyond the removal from dredging. "Properly analyzing the risks of an action requires an agency to use updated information or data; reliance on out-of-date or incomplete information may render the analysis of effects speculative and uncertain, warranting the preparation of an EIS." *City of Dallas v. Hall*, 562 F.3d 712, 720 (5th Cir. 2009). Without a hard look at indirect harms caused by turbidity and loss of sunlight from vessel and terminal operations, the Corp's analysis was "so flawed that it precluded assessment of reasonably foreseeable impacts." *Id.* The Corps failed to consider an important aspect of the impacts the project will cause to seagrass, in violation of NEPA.

118.    The Corps also failed to take a hard look at and analyze the beneficial and detrimental economic impacts of the Moda expansion project—which is part of the "public interest" review.

119.    In its EA, the Corps determined the economic effects of the action will be "beneficial." In its discussion, the EA highlights that the expansion project would have "economic benefits" for the applicant (Moda) because "the applicant would be able to accommodate Suezmax vessels for the export of petroleum products." The Corps does not explain how the economic benefit to the applicant weighs in favor of the public interest.

120.    The EA further explains that the proposed project would "improve navigation along La Quinta Channel as the proposed work will enhance navigational access to the site." Here, again, the EA fails to explain how the enhancing navigational access to the site weighs in favor of the public interest.

121.    Finally, the EA explains that the project would also benefit the "needs and welfare of the general public by increasing the supply and availability of energy." But, here again, the EA fails to explain how the expected increase in supply and availability of energy will result from the proposed Moda expansion project, or how it will result in an economic benefit to the general public.

122.    The EA fails to acknowledge that the crude oil will only be exported and will provide no local energy benefit.

123.    The EA fails to acknowledge or address the concerns raised by the local community (the general public) regarding expected detrimental economic impacts to small businesses, property value, and commercial fishing.

124.    In short, in its purported analysis of economic benefits, the EA only assesses the economic benefits that Moda is expected to incur, not the general public.

125.    The Corps, in its EA, also failed to take a hard look and analyze the increased risk of oil spills, leaks, accidents, and other associated impacts that will result from increased vessel traffic and crude oil transportation capacity.

126.    Although the Corps apparently thought the purpose of the expansion is to export liquified natural gas, the purpose of the expansion project is to meet the "increased export demands" of crude oil and "accommodate the additional and larger vessels beginning to call at U.S. ports." Moda plans to achieve this objective by more than doubling its current vessel capacity and increasing its volume capacity at the docks by over 2 million barrels.

127.    The Corps had a duty to take a hard look at the potential impacts that will arise from the increased vessel and crude oil capacity of the expanded terminal, including the associated increase in oil spill risk.

128.    The Corps, however, failed to consider this important factor associated with the permitting and construction of a deep-water ship dock to allow for increased ship traffic and oil development, in any serious manner. There is essentially no analysis or discussion indicating that the Corps took a hard look at these risks before making its decision, other than mere conclusory responses to comments.

32

129.    "Because a 'reasonably close causal relationship' exists between the Corps' issuance of the permit, the environmental effect of increased vessel traffic, and the attendant increased risk of oil spills, the Corps had a duty to explore this relationship further in an EIS." *Ocean Advocs. v. U.S. Army Corps of Engineers*, 402 F.3d 846, 867–68 (9th Cir. 2005) (internal citations omitted).

130.    The Corps violated NEPA and the CWA by failing to consider impacts on the neighboring community from air, noise and light pollution and loss of productive aquatic habitat for fishing and recreation.

131.    The EA summarily claims aesthetic impacts will be negligible because the Moda expansion project will be "confined to an existing commercial marine facility." The EA goes on to explain that any impacts are expected to be "short term, temporary adverse impact[s]," focusing only on impacts caused by the construction activities. The EA says nothing about the expected adverse impacts associated with the operation of the expanded facility and the dredging needed to maintain the significant deepwater berths.

132.    There is no indication that the Corps took a hard look at the expected adverse expects from the operation of the expanded facility, even though there were multiple public comments expressing concern about operation of the expanded facility causing increased noise and light pollution for the nearby residents.

133.    All residents of the city of Ingleside on the Bay, with a population of about 700 people, live less than 1.5 miles away from the existing docks at the Moda Terminal. Many homeowners live even closer, having located there to enjoy peaceful waterfront living in a pristine coastal setting. Many are concerned about loss in property value.

Residents already experience significant negative impacts due to noise and light pollution and odors emanating from the existing Moda terminal.  Residents included photos in their comment letters showing how visible the existing terminal is to their neighborhood and how close the vessels are that are docked at the current pier location.  The new pier will bring oil and vessel activities approximately 900 feet closer.

134.    The Corps' response to these comments and concerns was that they "found the potential effects from the project regarding these concerns to be *negligible.*" (Emphasis added.) This reflects a failure to take a hard look at this issue, as required by the CWA and NEPA.

## <u>Claim for Relief No. 3</u>:

### The Corps' failure to discuss and independently evaluate the purpose and need for the expansion project violated NEPA and the CWA.

135.    NEPA's implementing regulations require that an agency include brief discussions in an EA of the need for the proposal. 40 C.F.R. § 1508.9(b). The regulations further require that the agency "independently evaluate the information submitted . . . and shall be responsible for its accuracy, scope, and contents." 40 C.F.R. § 1506.5; *see also Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1270 (10th Cir. 2004) (assessment provided by an applicant "must be critically evaluated by the Corps"); *Friends of the Earth v. Hintz*, 800 F.2d 822, 835 (9th Cir. 1986) (while the Corps could rely on data provided by the application, it "nonetheless had an obligation to independently verify the information supplied to it").

136.    CWA implementing regulations require the Corps to conduct a public interest review in reviewing all permit applications. The regulations prohibit the issuance of a section 404 permit if the Corps "determines that it would be contrary to the public interest." 33 C.F.R. § 320.4(a).

137.    The applicant's purpose for the project must be "legitimate." *Sylvester v. U.S. Army Corps of Engineers*, 882 F.2d 407, 409 (9th Cir. 1989) ("Obviously, an applicant cannot define a project in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable."). "[I]f developers were permitted to artificially constrain the Corps' alternatives analysis by defining the projects' purpose in an overly narrow manner [,it] would frustrate the statute and its accompanying regulatory scheme." *Nat'l Wildlife Fed'n v. Whistler*, 27 F.3d 1341, 1346 (8th Cir. 1994).

138.    Here, the Corps failed to independently evaluate Moda's asserted purpose and need and ensure the project was in the public interest.

139.    Moda's CWA 404 permit application states: "The purpose of and the need for the proposed project is to provide the maritime infrastructure necessary to accommodate the increasing demand by existing and committed, future customers at the Moda Ingleside Oil Terminal in a logistically safe and efficient manner." As noted, the Corps apparently thought the purpose was to provide for larger ships to export liquified natural gas.

140.    Moda's asserted purpose is vague and ambiguous, but the Corps did nothing to verify the need or ensure the expansion is in the public interest. The Corps

provides no discussion in the EA of the need for the proposal, the alleged increasing demand, or what infrastructure is necessary to meet that demand. Without an independent evaluation of Moda's claims, the Corps violated NEPA and the CWA.

## **Claim for Relief No. 4:**

**The Corps' failure to analyze a reasonable range of alternatives to the proposed facility expansion, considering Moda's stated need, violated NEPA and the CWA.**

141.   Both NEPA and the CWA require agencies to conduct an alternatives analysis. *See* 42 S.S.C. § 4332(2)(E); 40 C.F.R. § 1508.9(b); 40 C.F.R. § 230.10(a)(4) ("For actions subject to NEPA, . . . the analysis of alternatives required for NEPA environmental documents . . . will in most cases provide the information for the evaluation of alternatives under [the CWA Section 404(b)(1)] Guidelines.").

142.   The consideration of alternatives is "the heart" of the NEPA process. 40 C.F.R. § 1502.14. The purpose of the requirement to consider alternatives is "to insist that no major federal project should be undertaken without intense consideration of other more ecologically sound courses of action, including shelving the entire project, or of accomplishing the same result by entirely different means." *Environmental Defense Fund v. Corps of Engineers*, 492 F.2d 1123, 1135 (5th Cir. 1974).

143.   "No decision is more important than delimiting what these 'reasonable alternatives' are [since] [o]ne obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence)." *Simmons v. United States Army Corps of Engineers*, 120 F.3d 664, 666 (7th Cir. 1997).

144.    Additionally, when a discharge involves a "special aquatic site," the Corps must presume that all practicable alternatives that do not involve a discharge into that site would have less adverse impact on the aquatic ecosystem, unless the applicant can clearly demonstrate otherwise. *Id.* § 230.10(a)(3).

145.    The Corps had a duty under NEPA and the CWA to rigorously explore, and objectively assess, all reasonable alternatives. The Corps breached its duties to rigorously explore and objectively assess all reasonable, practicable alternatives, in part, by failing to analyze as a practicable alternative the expansion of the Moda Terminal into the East Basin instead of the West Basin. Development in the East Basin would not require dredging and would avoid impacts to seagrass and wetlands.

146.    USFWS recommended that the proposed expansion project in the West Basin be denied, because the "East Basin appears to be sufficiently large to accommodate the activities proposed," and the Texas Parks and Wildlife Department questioned "why the East Basin cannot accommodate the activities proposed." Multiple public comments also requested the Corps consider an East Basin alternative.

147.    The Corps claimed the East Basin alternative described in the EA could not provide sufficient space to safely berth Suezmax vessels in two additional berths, but the EA contains no project dimensions or measurements, no specifications as to minimum lengths of docking equipment and infrastructure, or drawings.

148.    In rejecting an East Basin alternative, the Corps failed to sufficiently explain why construction in the East Basin is not feasible. *See All. to Save the Mattaponi v. U.S. Army Corps of Engineers*, 606 F. Supp. 2d 121, 130 (D.D.C. 2009) ("[T]he Corps

must do more than give vague explanations about the potential adverse effects of or potential political opposition to other alternatives.").

149.   Additionally, the project's purpose and need do not require the construction of two berths or even the requirement to berth Suezmax vessels. The Corps' decision to impose a requirement that a single criterion (or desire, as in the case of the goal to construct two berths) be fully met was arbitrary and capricious and was equivalent to defining a purpose and need that unduly restricts and precludes other alternatives.

150.   The Corps' failure to consider an adequate range of alternatives is contrary to NEPA, CWA, and is arbitrary, capricious, and an abuse of discretion, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

## <u>Claim for Relief No. 5:</u>

**The Corps' failure to impose adequate minimization measures to reduce indirect adverse impacts on seagrass and wetlands violated the CWA and APA.**

151.   The Corps failed to assess potential indirect impacts to seagrass and wetlands directly adjacent to the proposed project area. Consequently, the Corps failed to require minimization measures to reduce those adverse impacts, in violation of the CWA.

152.   The Clean Water Act limits the authority of the Corps to issue permits for the discharge of fill material into the waters of the United States. 33 U.S.C. § 1344(a), (b), (d); *id*. § 1362(7) (defining "navigable waters" as "waters of the United States"); 33 C.F.R. § 328.3(a)(1), (5), (6) (defining "waters of the United States" to include waters that may be used in interstate commerce, tributaries of such waters, and wetlands adjacent to those tributaries and waters). Specifically, Section 404(b)(1) of the CWA

requires the Corps to apply guidelines established by EPA to restore and maintain the integrity of aquatic ecosystems. 33 U.S.C. § 1344(b)(1); 40 C.F.R. § 230.1(a). The Corps' regulations state that a permit will be denied if the proposed discharge would not comply with the 404(b)(1) Guidelines. 33 C.F.R. § 323.6(a).

153.    Under these Guidelines, "degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts." 40 C.F.R. § 230.1(d). Discharging fill material in wetlands often destroys habitat and vegetation, degrades water quality, and diminishes wetlands' capacity to store floodwater and shield upland areas from erosion. *Id*. § 230.41(b). "Fundamental to [the 404(b)(1)] Guidelines is the precept that . . . fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact." *Id*. § 230.1(c).

154.    Discharging fill material into waters of the United States violates the Section 404(b)(1) Guidelines when (1) there is a practicable alternative that would have less adverse effect on the aquatic ecosystem; (2) the proposed filling would significantly degrade the aquatic ecosystem; or (3) the proposed filling does not include all appropriate and practicable measures to minimize potential harm to the aquatic ecosystem. *See id*. § 230.12(a)(3)(i)–(iii); *see also id*. § 230.10(a), (c), (d). If there remain unavoidable impacts, the Corps must decide what compensatory mitigation is required. *Id*. § 230.93(a)(1).

155.    The Corps cannot allow discharges unless all "appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on

the aquatic ecosystem." *Id*. §§ 230.10(d), 230.91(c)(2). Taken together, these requirements create a "very strong" presumption that the unnecessary alteration or destruction of an aquatic ecosystem should be discouraged as contrary to the public interest. *Buttrey v. United States*, 690 F.2d 1170, 1180 (5th Cir. 1982).

156.    Subpart H of the 404(b)(1) Guidelines, 40 C.F.R. §§ 230.70—230.77, provides examples of actions the Corps might take to minimize adverse effects, which courts have viewed as the "correct factors" for the Corps to consider when making its determination as to whether these steps have been taken. *Sierra Club v. U.S. Army Corps of Eng'rs*, No. Civ.A. 05-1724JAP, 2005 WL 2090028, at *17 (D.N.J. Aug. 29, 2005). These measures include: locating and confining the discharge to minimize smothering of organisms, 40 C.F.R. § 230.70(a); selecting discharge methods and disposal sites where the potential for erosion, slumping or leaching of materials into the surrounding aquatic ecosystem will be reduced, *id*. § 230.72(a); timing the discharge to minimize impact, *id.* § 230.72(d); using silt screens or other appropriate methods to confine suspended particulate/turbidity to a small area where settling or removal can occur, *id.* § 230.72(c); selecting sites or managing discharges to confine and minimize the release of suspended particulates to give decreased turbidity levels and to maintain light penetration for organisms, *id.* § 230.73(f); avoiding changes in water current and circulation patterns which would interfere with the movement of animals, *id.* § 230.75(a); and avoiding sites having unique habitat or other value, *id.* § 230.75(c).

157.    In this case, Moda determined that 0.15 acres of estuarine emergent wetland will be destroyed due to indirect impacts caused by severed hydrology once the expanded

bulkhead is constructed. No analysis is provided by either Moda or the Corps as to whether minimization measures could reduce those indirect impacts. It is simply a foregone conclusion.

158.    Additionally, the Corps simply took Moda's word that the Best Management Practices proposed ("BMPs"), turbidity curtains, and proposed slope stabilization will sufficiently protect seagrass beds, despite reservations expressed by the Texas Parks and Wildlife Department about the proposed slope mattress, based on other incidences along the Texas Gulf Coast. The Corps conducted no independent evaluation to ensure the adequacy of such measures or to determine if other alternative or additional measures could further minimize adverse impacts to seagrass.

159.    Public comments requesting information on minimization measures were ignored. TCEQ advised: "More detailed information is needed on what options were considered to minimize impacts, specifically to seagrass and emergent wetlands."

160.    USFWS also instructed that "[i]n addition to the proposed slope stabilization, the applicant evaluate and develop a plan to protect area seagrass beds immediately adjacent to the basins and along the east and west of the approach from vessel wakes."

161.    Moda responded to the comments, explaining that the "existing seagrass beds have persisted for decades adjacent to the existing site which includes regular nearby vessel traffic, including that from within the adjacent CCSC. It is the applicant's engineers' professional judgement that the slope stabilization measures provide adequate

protection to avoided seagrass." The Corps, however, provided no independent analysis to confirm or deny Moda's assertions.

162.    The Corps failed its duty to ensure all "appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. §§ 230.10(d), 230.91(c)(2). It failed to demonstrate that the discharges caused by the project will not have an unacceptable adverse impact and imposed no special conditions to minimize impacts to any estuarine wetland or submerged aquatic vegetation that may be adjacent to and/or indirectly impacted by the proposed project.

## Claim for Relief No. 6:

**The Corps violated NEPA and the CWA by failing to consider indirect, secondary, and cumulative impacts of past and reasonably foreseeable future activities.**

163.    The Corps must analyze and address the cumulative impacts of a proposed project. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976); 40 C.F.R. §§ 1508.7 (2019), 1508.25(c)(3) (2019).

164.    NEPA requires federal agencies to analyze "both the probability of a given harm occurring and the consequences of that harm if it does occur." *New York v. Nuclear Regul. Comm'n*, 681 F.3d 471, 482 (D.C. Cir. 2012).

165.    CEQ regulations define "cumulative impact" thusly: "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or persona undertakes such other actions.

Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

166.   "[A] meaningful cumulative impact analysis must identify (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate." *Del. Riverkeeper Network v. Fed. Energy Regul. Comm'n*, 753 F.3d 1304, 1319 (D.C. Cir. 2014) (quoting *Grand Canyon Trust v. F.A.A.*, 290 F.3d 339, 345 (D.C. Cir. 2002)).

167.   Cumulative impact analyses are insufficient when they discuss only the direct effects of the project at issue on a small area and merely contemplate other projects but have no quantified assessment of their combined impacts. *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 872 (9th Cir. 2020).

168.   The Corps' EA in this case failed to provide a sufficient cumulative impacts analysis, as contemplated by NEPA.

169.   The Corps' EA states that "the direct, indirect, and cumulative effects associated with the proposed placement of fill material into the subject wetlands would not cause further degradation of the watershed as a whole," and cross-references another section of the EA (the EA mistakenly references Section 8, though it likely intended to reference Section 9) for further discussion of the cumulative impacts. This section

acknowledges that the key issues in Corpus Christi Bay are water quality and loss of special aquatic sites, which includes the sea grass beds affected by this project.

170.   The Corps limited its cumulative impacts assessment to a period spanning five years in the past and five years in the future, without explaining the basis for this temporal limitation.

171.   Even with this arbitrary and capricious limitation the EA acknowledges that there have been major dredging projects, construction of marine terminals, construction of marinas, permits for oil and gas development, and other development in the area, and that "[r]easonably foreseeable future actions within this watershed include continued residential development, construction of new or expansion of several existing commercial marine terminals associated with liquefied natural gas processing facilities, expansion of the Port of Corpus Christi facilities, the La Quinta Gateway Project, the CCSC Improvement Project, and pending Corps permits for large dredge or fill activities."

172.   The EA provides no information about the location, area affected, amount of dredged material, or any other data of any kind about these admittedly major projects. There is no question that at least some of the reasonably foreseeable projects will have a significant impact on the environment, including air and water quality and loss of special aquatic sites.

173.   In addition, the cumulative impacts section assumed that there would be no indirect effects from operation of the MODA facility, although as explained above, the Corps did no analysis of potential adverse impacts to the public caused by the operation of the expanded facility.

174.    In sum, the Corps' failure to document, analyze and consider adequately the full range of significant direct, indirect, secondary, and cumulative environmental impacts of the project in conjunction with past, present, and reasonably foreseeable future actions is contrary to NEPA, the CWA, and is arbitrary, capricious, and an abuse of discretion, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

### Claim for Relief No. 7:

**The Corps' failure to consider the contribution of the Moda Terminal expansion, singularly and cumulatively, to climate change and its impacts violated NEPA and the CWA.**

175.    Related to the cumulative impacts analysis discussed above, NEPA calls for a quantification of the incremental impacts that the proposed project's emissions will have on climate change or on the environment more generally in light of other past, present, and reasonably foreseeable actions. *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin*., 538 F.3d 1172, 1216 (9th Cir. 2008). NEPA requires an analysis of the "actual environmental effects resulting from those emissions." *Id*.

176.    This principle that climate change impacts, where relevant, must be considered in NEPA analyses has been established for decades. *E.g. Border Power Plant Working Group v. Dept. of Energy*, 260 F. Supp. 2d 997, 1028-29 (S.D. Cal. 2003).

177.    The United States Supreme Court declared in 2007 that "the harms associated with climate change are serious and well recognized." *Massachusetts v. Environmental Protection Agency*, 549 U.S. 497, 499 (2007). This fact has only become more well-established in the past decade, as the impacts of climate change are now felt across the globe.

178.    It is also well established that fossil fuel production, transportation, and combustion play a central role in climate change. As a consequence, the federal courts have held that in the context of fossil fuel transportation infrastructure, climate change impacts are reasonably foreseeable and must be considered in NEPA analysis. This includes, at a minimum, downstream impacts of the fossil fuel being transported, *i.e.* impacts from end use of the fossil fuels being transported. Courts have also held that upstream emissions of greenhouse gases must be evaluated in the NEPA analysis. *See, e.g., Sierra Club v. FERC*, 867 F.3d 1357, 1372 (D.C. Cir. 2017) (reasonably foreseeable that oil transported will be burned and contribute to climate change); *see also Utah Physicians for a Healthy Environment v. Bureau of Land Management*, 2021 WL 1140247 (D. Utah 2021) (agency calculated the socioeconomic benefits of the project but not the socioeconomic costs of greenhouse gas emissions).

179.    In its EA, the Corps included a single paragraph, which apparently took the view that the Corps need only evaluate those activities within its direct control, not those that result from combustion of fossil fuels.

180.    Even with this arbitrarily limited scope, the Corps failed to quantify and evaluate the cumulative and incremental effects of climate change, including the potential for increased lifecycle greenhouse gas emissions and their associated costs, resulting from the approval of Moda's terminal expansion.

181.    For instance, the Corps failed to consider the climate change impacts of increased oil exports, which is the intended objective of the proposed project.

182.   In sum, the Corps' failure to consider reasonably foreseeable direct, indirect, and cumulative upstream and downstream impacts, including risks and impacts from climate change, violates NEPA and is arbitrary, capricious, and not in accordance with the law, in violation of the APA, 5 U.S.C. § 706(2)(A).

## VIII.  PLAINTIFFS' CLAIMS FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a) Declare that the Corps violated NEPA, its implementing regulations, and the APA by failing to prepare an EIS;

b) declare that the Corps violated CWA, its implementing regulations, the Corps' own regulations, and the APA by issuing a CWA permit;

c) vacate and set aside the challenged Permit;

d) order the Corps to prepare an EIS to cure all violations of NEPA, its implementing regulations, the CWA, and the APA;

e) issue a preliminary and permanent injunction against the Corps, enjoining approval and permitting of the Moda Terminal expansion project;

f) award Plaintiffs their reasonable attorneys' fees and costs for this action; and

g) grant such other and further relief as may be just and proper.

DATED: August 3, 2021

Respectfully submitted,

*/s/ Lauren Ice*
**Lauren Ice**
Attorney-in-charge
State Bar No. 24092560
S.D. Tex. Bar No. 3294105
**Marisa Perales**
State Bar No. 24002750

(*pro hac vice* motion to be filed)
**PERALES, ALLMON & ICE, P.C.**
1206 San Antonio St.
Austin, Texas 78701
P: (512) 469-6000
F: (512) 482-9346
lauren@txenvirolaw.com
marisa@txenvirolaw.com

**Robert Wiygul**
(*pro hac vice* motion to be filed)
**WALTZER WIYGUL & GARSIDE LLC**
1011 Iberville Drive
Ocean Springs, MS 39564
P: (228) 872-1125
F: (228) 872-1128
robert@wwglaw.com

**ATTORNEYS FOR PLAINTIFFS
INDIGENOUS PEOPLES OF THE
COASTAL BEND, KARANKAWA KADLA
TRIBE OF THE TEXAS GULF COAST,
and INGLESIDE ON THE BAY COASTAL
WATCH ASSOCIATION**