United States District Court
Southern District of Texas

**ENTERED**

July 27, 2023

Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| INDIGENOUS PEOPLES OF THE COASTAL BEND, KARANKAWA KADLA TRIBE OF THE TEXAS GULF COAST, and INGLESIDE ON THE BAY COASTAL WATCH ASSOCIATION, | § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 2:21-CV-00161 |
| UNITED STATES ARMY CORPS OF ENGINEERS, LIEUTENANT GENERAL SCOTT A. SPELLMON, in his official capacity, BRIGADIER GENERAL CHRISTOPHER G. BECK, in his official capacity, and COLONEL TIMOTHY R. VAIL, in his official capacity, | § § § § § § § § § | |
| Defendants, | § § | |
| and | § § | |
| ENBRIDGE INGLESIDE OIL TERMINAL, LLC (f/k/a MODA INGLESIDE OIL TERMINAL, LLC), | § § § § | |
| Intervenor-Defendant. | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

The Moda Ingleside Crude Export Terminal sits at the Corpus Christi Ship Channel in Ingleside, Texas. Originally, the Moda Terminal was located within a United States Navy Base—Naval Station Ingleside. In 2010, the Naval Station closed. In 2018, Moda Midstream purchased what is now known as the Moda Terminal. Today, the

Moda Terminal is the largest crude export terminal by volume in the Gulf Coast and exports oil to destinations across the globe.

This is an administrative law case arising out of an effort to expand operations at the Moda Terminal. Generally speaking, federal law requires a permit to discharge fill material into navigable waters. The proposed construction activities at issue in this case, which are necessary to expand operations at the Moda Terminal, are no exception. This is not the first time the Moda Terminal has needed a permit for construction-related activities. The Moda Terminal received its first construction permit from the U.S. Army Corps of Engineers (the "Corps") in 1987. That permit has been amended numerous times over many years in accordance with federal law.

Intervenor-Defendant Enbridge Oil Terminal, LLC, ("Enbridge") purchased Moda Midstream (and consequently, the Moda Terminal) in the Fall of 2021. Prior to that transaction, Moda Midstream had applied for an amendment to the existing permit that would enable it to construct additional infrastructure at the Moda Terminal. On May 5, 2021, the Corps granted Enbridge's application and authorized the requested expansions to the Moda Terminal.

Fearing the possible environmental effects from construction-related activities due to the Moda Terminal's expansion, Plaintiffs, two Native American Tribes and one local association (collectively, "I/K/I"), sued the Corps and its relevant leadership (collectively, "Federal Defendants") in this Court seeking to invalidate Enbridge's Corps-issued permit. I/K/I assert that the Corps' decision to issue Enbridge's requested permit violated the Administrative Procedure Act ("APA") because the decision was arbitrary

and capricious.   I/K/I also assert that the Corps' decision violated the National Environmental Policy Act ("NEPA") and the Clean Water Act ("CWA") because the Corps failed to adequately consider the ecological, societal, and other impacts resulting from its decision to issue the permit.  Enbridge intervened in this suit to defend the Corps' decision.  All Parties have filed motions for summary judgment.

Pending before the Court are I/K/I's Motion to Permit Extra-Record Evidence and Take Judicial Notice of Relevant Facts, (Dkt. No. 43),[1] and the Parties' cross motions for summary judgment and their respective responses and replies, (Dkt. Nos. 52, 53, 54, 55, 56, 58, 59).  After reviewing the motions, all responses and replies, the record, and the applicable law, the Court **DENIES** I/K/I's request to supplement the record, (Dkt. No. 43).  The Court **GRANTS** the Federal Defendants' Motion for Summary Judgment, (Dkt. No. 53), and Enbridge's Motion for Summary Judgment, (Dkt. No. 54).  Finally, the Court **DENIES** I/K/I's Motion for Summary Judgment, (Dkt. No. 52).

## I.   FACTUAL BACKGROUND

The Moda Terminal sits in the Corpus Christi Ship Channel in Ingleside, Texas. (Dkt. No. 54 at 14–15).  It has been in existence since 1987 when it received its first permit from the Corps.  AR000103.[2]  Since this original permit, the Moda Terminal has grown considerably, resulting in fifteen amendments.  AR000103–104.  The Moda Terminal has

---

[1]   The Court previously granted I/K/I's Motion conditionally and "carr[ied] the request" to "consider the propriety of the proposed extra-record evidence when addressing the merits of the summary judgment motions."  (Dkt. No. 57 at 5).  The Court "retain[ed] the right to refuse to evaluate evidence if the Court ascertains it is being used for an improper purpose."  (*Id.*).

[2]   The "AR" cites in this opinion are to the administrative record in this case.

also changed ownership on more than one occasion.  *Id.*  Currently, Intervenor-Defendant Enbridge is the owner and operator of the Moda Terminal.  (Dkt. No. 52 at 8 n.1); (*see also* Dkt. No. 54 at 14–15).

Enbridge plans to expand the Terminal's facilities and make improvements to it. (Dkt. No. 53 at 13); (*see also* Dkt. No. 54 at 15).  For example, Enbridge plans to construct five new barge docks, add a 1,700-foot-diameter turning basin, as well as a new deep-water ship dock.  AR000101–102.  Enbridge's proposed construction-related activities require dredging the surrounding seafloor.  *Id.*; AR000003–6.  Under federal law, these activities require a permit, and those planning to discharge dredged or fill material into U.S. waters must comply with Section 404 of the CWA.  *See* 33 U.S.C. §§ 1341(a), 1344; *see also* 33 C.F.R. § 336.1.

Section 404 of the CWA requires authorization from the Corps, commonly known as a "Section 404 permit," to discharge dredge or fill material into U.S. waters.  33 U.S.C. § 1344(a).  Those seeking a permit must go through Section 404's permit-review process, where an applicant sends their permit application to the Corps who evaluates it, considers the public's response, and then determines whether the permit-seeking activity adheres to various environmental criteria listed under Section 404's Guidelines.  33 C.F.R. § 336.1.

Enbridge went through Section 404's permit-review process between 2020 and 2021.  In January 2020, Enbridge submitted its original Section 404 application for the Moda Terminal Expansion Project.  AR000843–901; (*see also* Dkt. No. 1 at 20); (Dkt. No. 53 at 13).  Enbridge later withdrew the application in April 2020 to allow for additional data

collection. AR001434, AR000126, AR000593; (*see also* Dkt. No. 1 at 20). Then, in September 2020, Enbridge reinstated its previous application with revisions.[3] AR000386–87, AR000202; (*see also* Dkt. No. 1 at 21).

In its permit application, Enbridge described its Moda Terminal Expansion activities as follows:

> [To] make improvements to Berth 2A within the existing East Basin: increase the permitted width of the West Ship Basin from 390 feet wide to 475 feet to allow construction of new barge docks (Berths 7A, 7B, 7C, 8, and 9), add a 1,700-foot-diameter turning basin at the West Ship Basin entrance to the CCSC, add a new deep-water ship dock in the West Ship Basin, and conduct maintenance dredging operations in both the East and West Ship Basins.

AR000003.

---

[3]    The facts in this case implicate different sets of NEPA's implementing regulations in Chapter of V, on the Council on Environmental Quality ("CEQ"), of Title 40 of the Code of Federal Regulation. Enbridge argues that one of those sets of amended regulations, the 2022 regulations, "do not control" this case because all material facts in this case pre-date the 2022 regulations. (Dkt. No. 59 at 26). The Court agrees.

In determining whether NEPA's 2022 regulations should be used, the Court's "analysis begins with the text of [the regulation] in effect at the time this dispute arose." *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 204, 131 S.Ct. 871, 878, 178 L.Ed.2d 716 (2011). NEPA's 2022 regulations were issued in April 2022, and took effect one month later. *National Environmental Policy Act Implementing Regulations Revisions*, 87 Fed. Reg. 23453 (2022). The Environmental Assessment at issue in this case was published in April 2021, AR000154, which is over a year before the 2022 regulations took effect. So the 2022 regulations do not govern this case. *See Mccoy*, 562 U.S. at 201, 131 S.Ct. at 876 (analyzing the case under previous regulations because the events "giving rise to the dispute at issue in this case . . . arose prior to . . . promulgation of the new regulatory provisions"); *see also Alvin Indp. Sch. Dist. v. A.D. ex rel. Patricia F.*, 503 F.3d 378, 382 n.4 (5th Cir. 2007) (applying regulations as codified when the events of the case took place even though regulations had been amended "after the events of this case but before the case was heard and decided by the [administrative] Hearing Officer"); *Harrison Cnty., Miss. v. U.S. Army Corps of Eng'rs*, 63 F.4th 458, 463 n.7 (5th Cir. 2023) (same); *United States v. Mann*, 532 F. App'x 481, 489 (5th Cir. 2013) (same); *see infra* n.6.

In accordance with federal law, the Corps issued Public Notice of Enbridge's permit application, which invited public comments between February and March of 2020. AR000126, AR000760, AR001432.   Many comments were received during the public-comment period, including, but not limited to, from Plaintiff Ingleside on the Bay Coastal Watch Association, Plaintiff Indigenous People of the Coastal Bend, two state legislators, the U.S. Environmental Protection Agency, the U.S. Fish and Wildlife Service, the Texas Commission on Environmental Quality, the Texas Parks and Wildlife Department, as well as members of the public.   AR000107–113, AR001518; (Dkt. No. 54 at 15).   According to the Corps, the "majority of comments were in regard to cultural resources, [Environmental Impact Statement] requests, pollution, environmental concerns (including fish and wildlife), recreation concerns, and threatened and endangered species."   AR000125.   Enbridge responded to the public comments.   AR000113–125.

Following public comment and evaluation from other federal agencies, the Corps performed an Environmental Assessment ("EA") in accordance with federal law. AR000101–154.   On April 2, 2021, the Corps issued its EA for the Moda Terminal Expansion Project.   AR000154.   The EA in this case spans 54 pages and covers, among other items, the following topics: the project's overview; the project's amendment history; the Corps' legal role under relevant statutory and regulatory authority; the project's potential environmental impacts; Enbridge's proposed mitigation measures; the project's potential public benefit; and the feasibility of an alternative site.   AR000101–154.   After a review of Enbridge's application, the public's response, and its own analysis, the Corps concluded that the Moda Terminal Expansion Project would not have a "significant

impact on the quality of the human environment," and, under federal law, issued a Finding of No Significant Impact ("FONSI").  AR000153.  Accordingly, the Corps did not issue an additional document known as an Environmental Impact Statement ("EIS").  AR000126.

On August 3, 2021, two associations and one tribe—Ingleside on the Bay Coastal Watch Association, the Indigenous Peoples of the Coastal Bend, and the Karankawa Kadla Tribe of the Texas Gulf Coast[4]—brought a seven-claim suit[5] against the Corps.  (*See* Dkt. No. 1).  In their Complaint, I/K/I seek to invalidate the permit issued by the Corps to Enbridge, arguing that the Corps violated provisions of NEPA, the CWA, and the APA. (*Id.* at 24–47).  The Corps filed its Answer responding to all I/K/I's claims.  (Dkt. No. 22 at 16–28).  A few days later, Enbridge intervened, (Dkt. Nos. 23, 28), and filed an Amended Answer also responding to I/K/I's claims, (Dkt. No. 30 at 7–14).

---

[4]    The Corps' EA notes that "the Karankawa Nation is not a federally recognized tribe, thus they have no special consultation rights and are considered members of the general public." AR000138.  Regardless, the Court will use the term "tribe" colloquially to refer to the Karankawa Kadla Tribe of the Texas Gulf Coast.

[5]    The seven claims for relief are: (1) "[t]he Corps' failure to prepare an EIS violated NEPA, CWA, and the APA," (2) "[t]he Corps' failure to adequately consider the impacts of its permitting decision violated NEPA, CWA, and the APA," (3) "[t]he Corps' failure to discuss and independently evaluate the purpose and need for the expansion project violated NEPA and the CWA," (4) "[t]he Corps' failure to analyze a reasonable range of alternatives to the proposed facility expansion, considering Moda's stated need, violated NEPA and the CWA," (5) "[t]he Corps' failure to impose adequate minimization measures to reduce indirect adverse impacts on seagrass and wetlands violated the CWA and APA," (6) "[t]he Corps violated NEPA and the CWA by failing to consider indirect, secondary, and cumulative impacts of past and reasonably foreseeable future activities," and (7) "[t]he Corps' failure to consider the contribution of the Moda Terminal expansion, singularly and cumulatively, to climate change and its impacts violated NEPA and the CWA."  (Dkt. No. 1 at 24–47).

7

In February 2022, I/K/I moved to supplement the administrative record and introduce extra-record evidence, including a declaration by Dr. Kirk Cammarata as well as various articles and blog posts.  (Dkt. No. 43).  The Court conditionally granted the use of these documents, noting it would consider admitting them based on how Plaintiffs sought to use them in their merits briefing.  (*See* Dkt. No. 57 at 5).  This case has since advanced to the summary-judgment stage, and the Court will now rule on the issue of extra-record evidence.  *See infra* Sec. IV(A)(2).

Pending before the Court are I/K/I's, the Federal Defendants', and Enbridge's Cross Motions for Summary Judgment, (Dkt. Nos. 52, 53, 54).  In their Motion, I/K/I offer seven merits arguments, arguing that the Corps has acted unlawfully in the following ways:

1)   the Corps violated NEPA and the [CWA] by failing to take a hard look—or any look—at the risk of oil spills and other accidents, (Dkt. No. 52 at 20–22);

2)   the Corps violated NEPA and the [CWA] by failing to assess direct, cumulative and secondary impacts to seagrasses from current and expanded operations at the Moda terminal, (*id.* at 22–32);

3)   the Corps violated NEPA by failing to assess the impacts on the neighboring communities of noise and light pollution, (*id.* at 32–36);

4)   the Corps violated NEPA and the [CWA] by asserting without hard data or analysis that the benefits of the expansion outweigh the risks, (*id.* at 36–37);

5)   the Corps violated NEPA and the [CWA] by failing to analyze climate change and its impacts, even though the expansion can be expected to exacerbate climate change, (*id.* at 38–41);

6)   the Corps violated NEPA and the [CWA] by failing to document and consider cumulative impacts of past and reasonably foreseeably future activities, (*id.* at 41–45); and

7)    the Moda expansions will have significant impacts on the environment, and an environmental impact statement is required, (*id.* at 45–46).

Both the Federal Defendants and Enbridge responded to these arguments in their respective Cross Motions.  (*See* Dkt. Nos. 53, 54).  In addition to responding to I/K/I's merits arguments, both the Federal Defendants and Enbridge argue that I/K/I have forfeited arguments that they have either failed to raise during the notice-and-comment stage or failed to advance beyond their Complaint.  (Dkt. No. 53 at 20–23, 42–43, 46); (Dkt. No. 54 at 20–30, 31 n.3, 33, 38, 49 n.7, 66–67 n.8, 80).

## II.    STATUTORY AND REGULATORY BACKGROUND

This case presents complex statutory and regulatory issues.  Before diving into the merits, the Court will provide a brief overview of both NEPA and the CWA.

### A.    THE NATIONAL ENVIRONMENTAL POLICY ACT

Congress passed NEPA "to promote human welfare by alerting governmental actors to the effect of their proposed actions on the physical environment."  *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772, 103 S.Ct. 1556, 1560, 75 L.Ed.2d 534 (1983).  "NEPA . . . was intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States."  *Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 756, 124 S.Ct. 2204, 2209, 159 L.Ed.2d 60 (2004) (quoting 42 U.S.C. § 4321).

NEPA does not, however, set *substantive* environmental requirements.  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371, 109 S.Ct. 1851, 1858, 104 L.Ed.2d 377 (1989).  Instead, it is "a procedural statute, mandating a process rather than a result."  *Sierra Club v. Espy*, 38 F.3d 792, 796 (5th Cir. 1994) (citing *Robertson v. Methow Valley Citizens Council*,

490 U.S. 332, 350, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1989)).  "NEPA does not require

federal agencies to favor an environmentally preferable course of action, but rather

requires that they take a 'hard look at environmental consequences.'" *City of Dallas, Tex.*

*v. Hall*, 562 F.3d 712, 717 (5th Cir. 2009) (quoting *Robertson v. Methow Valley Citizens*

*Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1989)); *see also Fath v. Tex.*

*Dep't of Transp.*, 924 F.3d 132, 136 (5th Cir. 2018) (per curiam).  "NEPA merely prohibits

uninformed—rather than unwise—agency action." *Robertson*, 490 U.S. at 351, 109 S.Ct. at

1846.

    To this end, NEPA and its implementing regulations[6] require the federal

government to "identify and assess in advance the likely environmental impact of its

---

[6]    As discussed briefly in footnote 3 above, the Court must decide what version of the
regulatory text was in effect at the time of the events in this case.  At issue are Sections 1500–1508,
1515, 1516, 1517, and 1518 of Title 40 concerning the CEQ.  As Enbridge correctly points out, the
current version of the NEPA regulations promulgated in 2022 are inapplicable because they took
effect a year after the Corps' EA.  *National Environmental Policy Act Implementing Regulations*
*Revisions*, 87 Fed. Reg. 23453 (Apr. 20, 2022).  But there are two versions of the NEPA regulations
that pre-date the current, and inapplicable, 2022 version.  The Federal Defendants argue that the
Corps' EA, published in April 2021, AR000154, was subject to the regulations that preceded the
comprehensive change in 2020.  (Dkt. No. 53 at 12 n.1).  Thus, they assert that the Court's review
is governed by the regulations as written prior to the 2020 amendments and not the regulations
promulgated pursuant to the 2020 amendments.  (*Id.*).  The Court disagrees.

    The original NEPA regulations were issued in 1978.  *Implementation of Procedural Provisions*,
43 Fed. Reg. 55978 (November 29, 1978).  Since its inception, there have been few, perhaps even
only one, major amendments to NEPA's regulations.  *See e.g., National Environmental Policy Act*
*Regulations; Incomplete or Unavailable Information*, 51 Fed. Reg. 15618 (Apr. 25, 1985) (removal of
"worst case analysis").  In 2020, NEPA's regulations were again amended.  *Update to the*
*Regulations Implementing the Procedural Provisions of the National Environmental Policy Act*, 85 Fed.
Reg. 43304 (2020).  These amendments were "comprehensive[.]"  *Altamaha Riverkeeper v. U.S.*
*Army Corps of Eng'rs*, No. 4:18-CV-00251, 2020 WL 5837650, at *2 n.2 (S.D. Ga. Sept. 30, 2020).

    In the Fifth Circuit, courts "look to the code and *regulations as they existed at the time of the*
*events*" in the case.  *Richardson Indep. Sch. Dist. v. Michael Z*, 580 F.3d 286, 291 (5th Cir. 2009)
(emphasis added); *see also Harrison Cnty.*, 63 F.4th at 463 n.7.  And virtually all the material events
in this case occurred after the CEQ's final rule updating NEPA's regulations was published on
                                                                        (continue)

proposed actions, including its authorization or permitting of private actions." *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 36 (D.C. Cir. 2015) (citing *Pub. Citizen*, 541 U.S. at 756–57, 124 S.Ct. at 2209).    NEPA, which incorporates notice-and-comment procedures, serves the dual purposes of ensuring that "(1) agency decisions include informed and careful consideration of environmental impact, and (2) agencies inform the public of that impact and enable interested persons to participate in deciding what projects agencies should approve and under what terms." *Id.* at 36–37 (citing *Pub. Citizen*, 541 U.S. at 768, 124 S.Ct. at 2215–16).

If the agency's action will "significantly affect[] the quality of the human environment," the agency must prepare an EIS.  42 U.S.C. § 4332(C); *see also Pub. Citizen*,

---

July 16, 2020, or after it became effective on September 14, 2020.  *See* 85 Fed. Reg. 43304 (2020). Having withdrawn its application in April 2020, AR000265, Enbridge reinstated its application for a Section 404 permit on September 11, 2020—three days before the CEQ final rule took effect. AR000387; (Dkt. No. 24 at 5); (Dkt. No. 1 at 21).  The public comment period closed on March 23, 2021.  AR000126.  And the Corps published its EA—the agency document most at issue in this case—in April 2021, long after the 2020 amendments became effective.  AR000154.

Accordingly, the Court finds that the regulations as amended in 2020 govern the EA in this case.  *See United States v. Gutierrez*, 443 F. App'x 898, 911 (5th Cir. 2011) (finding that proceedings in an action filed before issuance of a new procedural rule were subject to the new rule); *see Mann*, 532 F. App'x at 489–90 (finding that "completion is 'the relevant conduct regulated,'" thus conduct "not completed before the [new] regulations took effect . . . was controlled by the [new] regulations"); *Nexen Petroleum U.S.A., Inc. v. Norton*, No. 2:02-CV-03543, 2004 WL 722435, at *7 (E.D. La. Mar. 31, 2004) (finding that leases executed before 1988 were appropriately subject to regulations promulgated in 1988).

The Court notes further that application of the amended regulations raises no retroactivity issue because the Corps' EA was not issued until April 2021, when the amendments were already in full effect.  Moreover, even if the Court were to apply the pre-2020 regulations, "the outcome would be the same."  *Nexen*, 2004 WL 722435, at *7–9 (finding that courts properly look "at the regulations in effect at the time it was determined that the agency should have acted[.]").

Accordingly, all citations in this Memorandum Opinion and Order refer to those regulations as codified at 40 C.F.R. Part 1500 (2021) pursuant to the Final Rule issued on July 16, 2020, *available at* https://www.govinfo.gov/content/pkg/FR-2020-07-16/pdf/2020-15179.pdf.

541 U.S. at 757, 124 S.Ct. at 2209–10.  But not all agency actions do.  *See, e.g., Pub. Citizen*, 541 U.S. at 757, 124 S.Ct. at 2209–10; *City of Dallas, Tex.*, 562 F.3d at 717.  To determine whether an EIS is necessary, an agency can first undertake the less costly and more efficient process of performing an EA.[7]  *City of Dallas, Tex.*, 562 F.3d at 717.  An EA  is a "concise public document" that "briefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS]."  *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 695 (5th Cir. 2018) (quoting *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 228 (5th Cir. 2007)) (cleaned up); *see also* 40 C.F.R. §§ 1508.1(h), 1501.5(c)(1) (2021).  The Fifth Circuit has described an EA as "a rough cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement — which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project — is necessary."  *City of Dallas, Tex.*, 562 F.3d at 717–18 (quoting *Sabine River v. U.S. Dept. of Interior*, 951 F.2d 669, 677 (5th Cir. 1992)).

---

[7]  **§ 1508.1 Definitions.**

* * *

(h) ***Environmental assessment*** means a concise public document prepared by a Federal agency to aid an agency's compliance with the Act and support its determination of whether to prepare an environmental impact statement or a finding of no significant impact, as provided in § 1501.6 of this chapter.

40 C.F.R. § 1508.1 (2021); *see also* 40 C.F.R. § 1501.5(c) (2021).

If an agency's EA demonstrates that the proposed action will result in "significant" effects or impacts to the environment,[8] then the agency must prepare an EIS.  *Atchafalaya Basinkeeper*, 894 F.3d at 695 (citing 42 U.S.C. § 4332(C)).  If the EA demonstrates that the project will not have significant effects or impacts, the agency must issue a FONSI and not an EIS.  *Id.*  The FONSI must "briefly present[] the reasons why an action . . . will not have a significant effect on the human environment[.]"  40 C.F.R. § 1508.1(l) (2021); *see also* 40 C.F.R. § 1501.6 (2021).

---

[8]   **§ 1508.1 Definitions.**

* * *

(g) Effects or impacts means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives, including those effects that occur at the same time and place as the proposed action or alternatives and may include effects that are later in time or farther removed in distance from the proposed action or alternatives.

(1) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic (such as the effects on employment), social, or health effects. Effects may also include those resulting from actions that may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

(2) A "but for" causal relationship is insufficient to make an agency responsible for a particular effect under NEPA. Effects should generally not be considered if they are remote in time, geographically remote, or the product of a lengthy causal chain. Effects do not include those effects that the agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action.

(3) An agency's analysis of effects shall be consistent with this paragraph (g). Cumulative impact, defined in 40 C.F.R. 1508.7 (1978), is repealed.

40 C.F.R. § 1508.1(g) (2021).

## B.   THE CLEAN WATER ACT

The CWA, 86 Stat. 816, as amended, 33 U.S.C. §§ 1251–1387, was enacted in 1972, and seeks to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1004 (5th Cir. 2019) (quoting 33 U.S.C. § 1251(a)); *see also, e.g., City of Milwaukee v. States of Ill. and Mich*, 451 U.S. 304, 318, 101 S.Ct. 1784, 1793, 68 L.Ed.2d 114 (1981) ("Congress' intent in enacting [the CWA] was clearly to establish an all-encompassing program of water pollution regulation.").

The CWA prohibits the discharge of pollutants into the Nation's navigable waters. *Shrimpers & Fishermen of the RGV v. U.S. Army Corps of Eng'rs*, 56 F.4th 992, 996 (5th Cir. 2023) (citing 33 U.S.C. §§ 1311(a), 1362(6)). These waters include wetlands. *Id.* (citing 40 C.F.R. § 230.3(b)).[9] The Secretary of the Army, through the Corps, is authorized to regulate discharges of dredge and fill materials into navigable waters. 33 U.S.C. § 1344. For example, the Corps may approve a Section 404 dredge-and-fill permit authorizing the discharge of fill material into navigable waters. 33 U.S.C. §§ 1342(a), 1344(e). The Corps' permitting authority accordingly extends to certain wetlands adjacent to navigable waters. *See Nat'l Ass'n of Mfrs. v. Dep't of Defense*, 583 U.S. ____, ____, 138 S.Ct. 617, 625, 199 L.Ed.2d 501 (2018) (citing *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985)). The Corps issues Section 404 permits

---

[9]     The July 2020 amendments to NEPA's regulations only affected Parts 1500–1508, 1515, 1516, 1517, and 1518 of the Title 40 of the C.F.R. *See* 85 Fed. Reg. 43304 (2020). Part 230 of Title 40, governing Section 404(b)(1) guidelines for disposal sites for dredged or fill material, was not affected by the amendments. The version of Part 230 currently in effect was also in effect at the time of the events in this case. *See, e.g., Shrimpers*, 56 F.4th at 995–96 (applying the current version of Part 230 to a review of a permit issued in 2020).

in accordance with the applicable regulations.  *See generally* 33 C.F.R. Part 320 (Corps' General Regulatory Policies); 40 C.F.R. Part 230 (Subpart B) (Compliance with the [Section 404] Guidelines).

The CWA's Section 404 Guidelines, codified in 33 U.S.C. § 1344, "provide a three-step framework that the Corps must follow when issuing permits."  *Shrimpers*, 56 F.4th at 996.  First, no discharge can be permitted if there is a practicable alternative, meaning an alternative that is "capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes[.]"  *Id.* (quoting 40 C.F.R. § 230.10(a)(2)).  Second, the Corps may not issue a permit unless "appropriate and practicable steps have been taken which will minimize potential adverse impacts."  *Id.* (quoting 40 C.F.R. § 230.10(d).  Third, depending on what is practicable and capable, issuance of a permit requires compensatory mitigation "for unavoidable environmental losses[.]"  *Id.* (citing 33 C.F.R. § 332.3(a)(1)).

In other words, the Corps may issue a permit only if it finds that: (1) there will not be "significantly adverse effects" to human health or welfare, or aquatic life or ecosystems; (2) there are no "practicable alternatives" that would be less environmentally harmful; and (3) there are steps taken to "minimize potential adverse impacts of the discharge on the aquatic ecosystem."  40 C.F.R. § 230.10.  Additionally, the Corps must also undertake a public interest review, and "a permit may not be granted if it is 'contrary to the public interest.'"  *Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, ____ F.Supp.3d. ____, ____, No. 1:20-CV-03817, 2022 WL 5434208, at *20 (D.D.C. Oct. 7, 2022) (quoting 33 C.F.R. § 320.4(a)(1)).  This requires the Corps' decision whether to issue

15

a permit to be based on "an evaluation of the probable impacts, including the cumulative impacts, of the proposed activity and its intended us[e] on the public interest." *Id.* (quoting 33 C.F.R. § 320.4(a)(1)).   In evaluating the public interest, the Corps "must balance the [permit's] benefits . . . against  its 'reasonably foreseeable detriments.'" *Id.* (quoting 33 C.F.R. § 320.4(a)(1)).

## III.    LEGAL STANDARD

### A.    SUMMARY JUDGMENT GENERALLY

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018) (quotations omitted).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the record evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2253, 91 L.Ed.2d 265 (1986).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). If a defendant seeks summary judgment on an affirmative defense, the moving party "must establish beyond dispute all of the defense's essential elements." *Bank Of La. v. Aetna U.S. Healthcare Inc.*, 468 F.3d 237, 241 (5th Cir. 2006).

If the movant meets this burden, the nonmovant must then come forward with specific facts showing there is a genuine issue for trial.  Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).  The nonmovant must "go beyond the pleadings and by [the nonmovant's] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015).  "The nonmovant must identify specific evidence in the record and articulate the precise manner in which that evidence supports his or her claim." *Carr v. Air Line Pilots Ass'n*, 866 F.3d 597, 601 (5th Cir. 2017) (cleaned up).  "If the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019).

In reviewing a motion for summary judgment, the district court must view the evidence in the light most favorable to the nonmovant. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).  This means that factual controversies are to be resolved in the nonmovant's favor, "but only when . . . both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075.

**B.  SUMMARY JUDGMENT REVIEW OF ADMINISTRATIVE ACTIONS UNDER THE APA**

The Corps' EA and permitting decisions are reviewed under Section 706 of the APA, which requires the Plaintiffs to show that the Corps' actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without

observance of procedure required by law[.]"   5 U.S.C. § 706(2)(A), (D); *Atchafalaya Basinkeeper*, 894 F.3d at 696–97 (applying the arbitrary and capricious standard to a NEPA challenge).  The Supreme Court has explained a court's role in reviewing agency action under the arbitrary and capricious standard:

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency.  Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."  In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983) (citations omitted).  In short, "[t]his is a demanding standard[,]" *Atchafalaya Basinkeeper*, 894 F.3d at 697, whereby "a reviewing court has the 'least latitude in finding grounds for reversal.'"  *Sabine River Auth.*, 951 F.2d at 678 (quoting *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538 (11th Cir. 1990).

"NEPA does not prohibit the undertaking of federal projects patently destructive of the environment; it simply mandates that the agency gather, study, and disseminate information concerning the projects' environmental consequences."  *Id.* at 676.  This Court's "task is thus to determine whether the agency 'adequately considered the values

set forth in NEPA and the potential environmental effects of the project before reaching a decision on whether an [EIS] was necessary.'" *La. Crawfish Producers Ass'n-W. v. Rowan*, 463 F.3d 352, 355 (5th Cir. 2006) (quoting *Sierra Club v. Hassell*, 636 F.2d 1095, 1097 (5th Cir. Unit B 1981)).  "The agency, and not the court, has the discretion to choose from among sources of evidence, and an agency may rely on its own experts, so long as they are qualified and express a reasonable opinion." *Id.* at 355–56.

"When reviewing the decision of an administrative agency, a motion for summary judgment stands in a somewhat unusual light, in that the administrative record provides the complete factual predicate for the court's review." *City of Shoreacres v. Waterworth*, 332 F.Supp.2d 992, 1004 (S.D. Tex. 2004) (cleaned up), *aff'd*, 420 F.3d 440 (5th Cir. 2005). Accordingly, the Court's task is to consider the administrative record as a whole, without re-weighing evidence, and determine whether the Corps acted arbitrarily, capriciously, or in violation of the law in its decision to issue the permit to Enbridge.

## IV.   DISCUSSION

The following will provide a brief overview of the organization of the rest of this opinion.  The Parties' have identified three broad areas for the Court to address: (1) threshold issues, (2) procedural issues, and (3) merits issues.  First, the Court will address the threshold issues of I/K/I's standing to bring this suit and the admissibility of extra-record evidence.  *See infra* Section IV(A).  Second, the Court will address the procedural issues raised by the Defendants regarding whether I/K/I have waived or forfeited any of their merits arguments.  *See infra* Section IV(B).  Finally, the Court will

address the Parties' merits arguments regarding whether the Corps violated NEPA and the CWA.  *See infra* Section IV(C).

### A.   THRESHOLD ISSUES

The Parties have initially raised two threshold issues: standing and the admissibility of extra-record evidence.  (*See generally* Dkt. Nos. 43, 52, 53, 54).[10]  For the following reasons, the Court holds that I/K/I have established that they have standing to bring the case.  The Court further holds that I/K/I have not carried their burden of demonstrating the admissibility of their proposed extra-record evidence.

### 1.   Standing

The first issue is standing.  In their Motion, I/K/I assert that each Plaintiff has established standing to bring this case.  (Dkt. No. 52 at 16–18).  No one contests I/K/I's standing.  (*See generally* Dkt. Nos. 53, 54).  And the Court agrees with I/K/I and is satisfied that I/K/I have established standing.

#### a.   Standing Requirements:  Article III and Associational Standing

To bring a lawsuit in federal court, a plaintiff must have standing.  *Fed. Election Comm'n v. Cruz*, 596 U.S. ____, ____, 142 S.Ct. 1638, 1646, 212 L.Ed.2d 654 (2022).  This is a non-waivable, jurisdictional requirement.  *La. Landmarks Soc., Inc. v. City of New Orleans*, 85 F.3d 1119, 1122 n.3 (5th Cir. 1996).  A plaintiff does not always need direct standing, *see Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586–87 (5th Cir. 2006), because the

---

[10]    In conditionally granting the Defendants' Motion to Permit Extra-Record Evidence and Take Judicial Notice of Relevant Facts, (Dkt. No. 43), the Court stated that it would, at a future date, "consider the propriety of the proposed extra-record evidence when addressing the merits of the summary judgment motions."  (Dkt. No. 57 at 5).

Supreme Court "has recognized that an association may have standing to assert the claims of its members[.]"  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).  To have associational standing, an associational plaintiff must establish each element of the following three-part test: "(1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members."  *Benkiser*, 459 F.3d at 587 (citing *Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441).

To independently meet Article III's standing requirements, a plaintiff must demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)).  Plaintiffs who invoke federal jurisdiction "bear[] the burden of establishing these elements."  *Daves v. Dallas Cnty., Tex.*, 22 F.4th 522, 542 (5th Cir. 2022) (en banc) (citing *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136).

To satisfy the first element, injury in fact, a plaintiff must show "a harm suffered . . . that is concrete and actual or imminent, not conjectural or hypothetical."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103, 118 S.Ct. 1003, 1016, 140 L.Ed.2d 210 (1998) (cleaned up).  To satisfy the second element, causation, the plaintiff must establish "a fairly traceable connection between the plaintiff's injury and the complained-of conduct

of the defendant." *Id.* at 103, 118 S.Ct. at 1016–17.  To satisfy the third and final element, redressability, there must be "a likelihood that the requested relief will redress the alleged injury." *Id.* at 103, 118 S.Ct. at 1017.

Environmental cases add an additional consideration to the injury-in-fact requirement.  Namely, "courts must carefully distinguish between injury to the petitioner and injury to the environment." *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 537 (5th Cir. 2019).  Because "Article III standing requires injury to the petitioner, . . . [i]njury to the environment is insufficient." *Id.* (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000)).  In the context of environmental cases, a person suffers an injury in fact when the challenged activity will lessen "the aesthetic and recreational value[] of the area" that they use.  *Friends of the Earth*, 528 U.S. at 183, 120 S.Ct. at 705.  Because injury to the environment alone is not sufficient to establish an injury in fact, a person's "aesthetic, recreational, and scientific interests provide that link." *Ctr. for Biological Diversity*, 937 F.3d at 537.

Environmental cases also require courts to examine the imminence of a party's claimed injury in fact.  Because an injury in fact must be "actual or imminent, not conjectural or hypothetical," *Spokeo*, 578 U.S. at 339, 136 S.Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136), "environmental interests cannot support an injury in fact unless [the plaintiffs] have been actually harmed or imminently will be." *Ctr. for Biological Diversity*, 937 F.3d at 537.  In other words, a person's past visit to an affected area "proves nothing," *Lujan*, 504 U.S. at 564, 112 S.Ct. at 2138, and does not sufficiently establish an

injury in fact.  So in the context of environmental cases, parties must plead more than a past harm to establish that they will suffer an injury in fact.  *See id.*

Importantly, a plaintiff's *intent to return* to the affected area does not establish an actual or imminent injury in fact.  *See Lujan*, 504 U.S. at 564, 112 S.Ct. at 2138.  Instead, "a[] description of concrete plans" or "a[] specification of *when* the some day" the plaintiff will suffer the harm is required.  *Id.* (emphasis in original).  For example, the Fifth Circuit has found that an injury in fact exists based on "future planned activities" where a plaintiff had "specific plans" to visit the affected area over the course of the future year, *Ctr. for Biological Diversity*, 937 F.3d at 539, and where another plaintiff had "plan[s] to visit" the affected area "at least twice in the near future."  *Id.*

In short, to satisfy the injury-in-fact prong of the traditional Article III standing analysis, each Plaintiff must establish that one of their respective members has a sufficient injury, which requires more than a mere intent to return to the area surrounding the Moda Terminal Expansion Project.  I/K/I's representative members can satisfy this requirement by showing "future planned activities" or "specific plans" to visit the area surrounding the Moda Terminal Expansion Project.

### b.   I/K/I's Associational Standing

I/K/I assert, and no Defendants dispute, that they have associational standing to bring this suit on behalf of their members, represented by Sandra Love Sanchez, Absolem Yetzirah, and Patrick Nye, respectively.  (Dkt. No. 52 at 16–18).  I/K/I argue that "[e]ach attests at length to a close personal, spiritual and geographical connection to the area that will be affected by the Moda Terminal expansion; that his or her experience will be

damaged by the increased industrialization of this area and damage to adjacent resources; and that the organization to which they belong has a purpose in keeping with the requests in this suit." (*Id.* at 16). The Court agrees with I/K/I's assertion that they have satisfied the three requirements for associational standing: fulfillment of the traditional standing elements required under Article III, evidence of germaneness to the association, and establishment that relief does not require participation of individual members.

<u>Article III's Traditional Standing Requirements</u>

Sandra Love Sanchez is a founding member of Indigenous Peoples, and, based on the evidence provided in her affidavit,[11] (*see* Dkt. No. 52-1 at 7–14), she satisfies the requirements for Article III standing. Sanchez's interest in the affected area and imminent plans to visit are sufficient to allege an injury in fact. Sanchez states that the affected area, where her group "hold[s] spiritual ceremonies," is considered "sacred" by the group. (*Id.* at 10). It is the site of various forms of "recreational, educational,

---

[11] As an evidentiary matter, "[p]etitioning associations may [offer] . . . affidavits from members," *Food & Water Watch v. FERC*, 28 F.4th 277, 283 (D.C. Cir. 2022), to show that a member independently meets the triad of Article III standing requirements, "injury and fact, causation, and redressability," *Steele Co.*, 523 U.S. at 103, 118 S. Ct. at 1017; *see also Lujan*, 504 U.S. at 561, 112 S. Ct. at 2136 ("[E]ach element [of Article III standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation."); *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 n.2 (5th Cir. 2010) (holding that affidavits were acceptable evidence to establish the germaneness element of associational standing).

The Parties dispute the admission of extra-record evidence generally for the purpose of adjudicating the merits of this case. (*See generally* Dkt. Nos. 43, 44, 45). But the Federal Defendants "agree" that the three affidavits "are admissible to show Article III jurisdiction[.]" (Dkt. No. 44 at 6 n.1). Similarly, Enbridge "has no objection to the consideration of these [affidavits] for [the] limited purpose" of establishing standing. (Dkt. No. 45 at 12). Thus, the remaining extra-record evidence notwithstanding, the Court will consider the affidavits. *See infra* Sec. (IV)(A)(2).

environmental, and spiritual activities[.]"  (*Id.* at 9).  She has plans "to continue to visit approximately once a month."  (*Id.* at 10).  Sanchez satisfies the traceability, or causation, requirement by stating that "[i]f the MODA terminal expands and its operations expand, my people and I will have to watch more of the sacred beauty of this land and water disappear and deteriorate my spiritual, recreational, and aesthetic enjoyment of the area." (*Id.* at 11).  Finally, she establishes the element of redressability by asserting that her "concerns regarding this project will be addressed if this challenge is successful, because it would require the agency to look further into the project and inform the public about the harmful and dangerous impacts of the MODA expansion."  (*Id.* at 13).

Yetzirah's affidavit establishes that he independently meets the requirements of Article III standing.  (*Id.* at 16–23).  Absolem Yetzirah is a member of the Karankawa Kadla Tribe.  (*Id.* at 16).  Believed by many to be extinct, (*id.* at 21), the Karankawa Kadla "were one of the largest and most successful tribes in the Texas Gulf Coast area."  (*Id.* at 20).  Yetzirah has plans to continue to visit the affected area annually, "hopefully more," to pray with the tribe, and recounts that it "is one of the last remnants where [they] can go to pray."  (*Id.* at 18–19).  He states that "this place has special significance given the undisturbed natural area and its relationship to a known prior encampment of our ancestors."  (*Id.* at 19).  Harm to his interests is imminent because he "would like to visit the area . . . as frequently as once a month and to bring my whole clan with [him] so that [they] could observe the land and water in the area where [their] ancestors did and sit in silent prayer together."  (*Id.* at 20).  Yetzirah cites "the planned expansion" by the Intervenor Defendants as the cause of his injury.  (*Id.*).  Finally, he states that "if this

challenge is successful" in "[r]equiring the Army Corps to conduct an Environmental Impact Study[,]" his injuries would be redressed.  (*Id.* at 22).

Patrick Nye's affidavit also satisfies each requirement of Article III standing.  (*Id.* at 25–34).  Nye is the "president of the Board of Directors of the [IOBCWA], a Texas-based nonprofit whose purpose is 'to promote the health, safety, and quality of life for the residents of the City of Ingleside on the Bay and coastal communities through research, education, communications and action.'"  (*Id.* at 25).  Nye lives in a home near the affected area, and "[a]t its closest, the MODA Oil Terminal property line is 810 feet from [his] house."  (*Id.* at 26).  He and his family enjoy recreational activities in the area as well as the area's aesthetic beauty.  (*Id.* at 28).  He claims that his interests will be harmed if the planned expansion is allowed to continue because it would worsen the pollution, noise, and odor already generated by the existing oil terminal.  (*Id.* at 28–29).  Additionally, the planned expansion would prevent him and his family "from enjoying the many activities and events that [they] have built [their] lives around."  (*Id.* at 29).  Finally, he believes that if the Court requires "further environmental analyses and review [of] alternative options," that relief would "address and avoid many of the environmental, recreational, and health-based harms" posed by the project.  (*Id.* at 34).

<u>Germaneness to the Association</u>

Indigenous Peoples is a Texas non-profit, membership-based organization whose mission is "to preserve and protect the history, and the natural and cultural resources of indigenous people, who continue to live in the geographical region known as the Texas Coastal Bend[.]"  (Dkt. No. 52 at 7–8).  The group "is also dedicated to educating and

advocating on behalf of its members and local indigenous people on issues related to protection of the natural environment, places of cultural significance, indigenous rights and justice, and indigenous cultural education." (*Id.* at 8). The organization's efforts to protect Sanchez's interests are directly germane to their purpose.

The Karankawa Kadla Tribe, made up of roughly 300 members, "is indigenous to the Texas Coastal Bend," (*id.* at 16–17), and "seek[s] to exist peacefully with all people, so long as they honor and respect all life and cultures." (*Id.* at 22). The tribe's oral history traces their ancestry "from the Coastal Bend area to Mexico and then back to Texas." (*Id.* at 16–17). The tribe's history "has been either erased, eradicated, or withheld," and their present goal is to "reclaim" pieces of their history that have been lost over time. (*Id.* at 17). The area surrounding the planned expansion "was once home to over 500 Karankawa Kadla tribal members" and could hold "pottery shards and other artifacts[.]" (*Id.* at 18). The tribe's effort to prevent "[f]urther disturbing this land with the planned expansion" is germane to their stated purpose of ensuring they are not "erase[d] . . . from history." (*Id.* at 20).

The IOBCWA is made up of over 140 members and exists "to promote the health, safety, and quality of life for the residents of the City of Ingleside on the Bay and coastal communities through research, education, communications and action." (*Id.* at 25). It was founded out of the community's concern for "sea level rise and the impact it would have on [its] low-lying coastal community." (*Id.*). The organization's efforts to protect the interests of its members and their quality of life in this action is germane to the organization's stated purpose.

27

<u>Individual Member Participation Not Required to Grant Relief</u>

The claims brought by the associations are administrative in nature and are not of the nature that "the individual participation of each injured party [is] indispensable to proper resolution of the cause[.]" *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2122, 45 L.Ed.2d 343 (1975); (*see* Dkt. No. 1 at 24–47).  Neither does the relief requested, (*see* Dkt. No. 1 at 47), prevent the associations from "properly pursu[ing] [the claims] on behalf of its members[.]"  *Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441.

### 2.   **Extra-Record Evidence**

In September 2022, the Court conditionally granted I/K/I's Motion to Permit Extra Record Evidence and Take Judicial Notice of Relevant Facts, (Dkt. No. 43).  (*See* Dkt. No. 57).  Accordingly, the second threshold issue the Court will discuss is I/K/I's unresolved Motion to Permit Extra Record Evidence, exercising its reserved "right to refuse to evaluate evidence" that it finds is "being used for an improper purpose."  (*Id.* at 5).  For the following reasons, the Court declines to permit extra-record evidence.

I/K/I ask the Court to consider nine pieces of evidence[12] outside the administrative record and to take judicial notice of other information.[13]  (Dkt. No. 43 at 2–3).  I/K/I argue that the evidence and information are necessary for them to establish

---

[12]   Those pieces of evidence are Declaration of Sandra Love Sanchez, Declaration of Absolem Yetzirah, Declaration of Patrick Nye, Declaration of Dr. Kirk Cammarata, two letters from Patrick Nye to Mark Pattillo, a presentation on channel improvement from the Port of Corpus Christi, and two press releases from the Port of Corpus Christi.  (Dkt. No. 43 at 2–3).

[13]   This information includes a March 2021 tanker accident at the Port of Corpus Christi, a navigational chart excerpt from the National Oceanic and Atmospheric Administration, a 2018 climate assessment from the U.S. Global Change Research Program, and Moda's 2021 application (and their amended application) for amendment of their Air Permit.  (Dkt. No. 43 at 3).

that they have standing, (*id.* at 6), that the Fifth Circuit generally permits the use of extra-record evidence in NEPA cases, (*id.* at 3–6), and that consideration of extra-record evidence is necessary under the second *Medina* situation where the district court needs to supplement the record with background information in order to determine whether the agency considered all of the relevant factors.  (*Id.* at 6–14); (*see also* Dkt. No. 52 at 12–13); (Dkt. No. 55 at 32–33); *see Medina Cnty. Env't. Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010) (permitting supplementation of the record in three discrete circumstances).  I/K/I do not argue for supplementation of the record under the first or third *Medina* situations.  (*See* Dkt. No. 43 at 6–14); *Medina*, 602 F.3d at 706.

In response, the Federal Defendants and Enbridge first note that the "record rule" does not apply to the standing inquiry and that they have no objection to the use of extra-record evidence for that basis.  (Dkt. No. 44 at 6 n.1); (Dkt. No. 45 at 12); *see supra* n.11.  But regarding the use of extra-record evidence outside of the standing inquiry, they argue that there is no general NEPA exception to the record rule, (Dkt. No. 44 at 6–7); (Dkt. No. 45 at 8–9), and that the second *Medina* situation is not satisfied, (Dkt. No. 44 at 13–18); (Dkt. No. 45 at 7–8).  Enbridge further asserts that I/K/I conflate *supplementing* the record with *permitting extra-record evidence*, (Dkt. No. 45 at 14–15), and that I/K/I have forfeited the consideration of the extra-record evidence by not submitting it during the notice-and-comment period, (*id.* at 17–19).  The Court agrees with the Defendants.

Known as the "record rule," the evaluation of the merits of an agency's action under the APA is generally confined to the administrative record alone.  *See Medina*, 602 F.3d at 706.  Absent this rule, "there would be little hope that the administrative process

could ever be consummated in an order that would not be subject to reopening." *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 555, 98 S.Ct. 1197, 1217, 55 L.Ed.2d 460 (1978) (citing *ICC v. Jersey City*, 322 U.S. 503, 514, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420 (1944)).

The Fifth Circuit has identified three situations that warrant an exception to the record rule:

> (1) the agency deliberately or negligently excluded documents that may have been adverse to its decision, . . .
>
> (2) the district court needed to supplement the record with "background information" in order to determine whether the agency considered all of the relevant factors, or
>
> (3) the agency failed to explain administrative action so as to frustrate judicial review.

*Medina,* 602 F.3d at 706. But supplementing the administrative record is only allowed in "unusual circumstances," and the burden is on the moving party to demonstrate as much. *Id*. (quotations omitted).

I/K/I have not met their burden under the APA for going outside the administrative record. First, there is no general NEPA exception to the record rule. *See Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, No. 3:18-CV-00023, 2019 WL 13159731, at *5 (M.D. La. May 14, 2019) (finding that "[s]imply because [the *Medina*] exception may apply more frequently in NEPA cases does not eviscerate the record review rule in NEPA cases"). For the existence of a broad NEPA exception to the record rule, I/K/I cite to *La. Union del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 141 F.Supp.3d 681, 694 (S.D. Tex. 2015), which in turn relies on other district court and out-of-circuit cases. (Dkt. No. 43 at

3–6).  But I/K/I have not pointed the Court to, nor did the Court find, a binding case holding that NEPA cases are *per se* exempt from the record rule.  *See La. Crawfish Producers Ass'n West v. Mallard Basin, Inc.*, No. 6:10-CV-01085, 2019 WL 171693, at *5 (W.D. La. Jan. 10, 2019) (finding that "admission under the NEPA exception is not automatic" and courts should only consider extra-record evidence where "the administrative record is [] inadequate").  While I/K/I are correct that the Fifth Circuit, when appropriate, has been receptive to the use of extra-record evidence in certain NEPA cases due to their technical nature, *see, e.g.*, *Sierra Club v. Peterson*, 185 F.3d 349, 369–70 (5th Cir. 1999) (finding that deviation from the record rule "occurs with more frequency" in NEPA cases), *rev'd on other grounds on reh'g en banc*, 228 F.3d 559 (5th Cir. 2000), it does not follow that there is a *per se* NEPA exception to the record rule.  *See, e.g., Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 248 (5th Cir. 2006) (affirming a district court's denial of the use of extra-record evidence in a NEPA claim); *Atchafalaya Basinkeeper*, 2019 WL 13159731, at *5 (denying motion for extra-record evidence for NEPA claim).

I/K/I rely on the unpublished decision in *Davis Mountains Trans-Pecos Heritage Ass'n. v. Fed. Aviation Admin.*, 116 F. App'x 3, 12 (5th Cir. 2004) in support of their position. However, the only published Fifth Circuit case to interpret *Davis Mountains* held that "[e]xtra-record evidence may be admitted if necessary to determine whether an agency has adequately considered adverse environmental impacts."  *Coliseum Square Ass'n, Inc.*, 465 F.3d at 247; *see also Atchafalaya Basinkeeper*, 2019 WL 13159731, at *5 (finding that "the *Davis Mountains* court simply applied [the] second exception set forth in *Medina County*"). Rather than endorse a blanket exception to the record rule for NEPA cases, the Fifth

Circuit in *Coliseum* applied the rule recognized in *Medina* that, under "unusual circumstances . . . the district court [may] supplement the record with background information in order to determine whether the agency considered all of the relevant factors[.]" *Medina*, 602 F.3d at 706 (cleaned up); *see also La. Crawfish*, 2019 WL 171693, at *5 (noting that "*Medina* was not  NEPA case and relates only to the general admissibility of extra-record evidence").  In sum, there is no NEPA exception to the record rule.

By default, review under the APA is limited to the administrative record.  5 U.S.C. § 706.  "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam).  But "the Fifth Circuit allows a court to consider additional documents to get a sense of the universe of potential information in deciding whether the agency conducted a sufficiently thorough assessment." *Gulf Coast Rod, Reel & Gun Club, Inc. v. U.S. Army Corps of Eng'rs*, No. 3:13-CV-00126, 2015 WL 1883522, at *4 (S.D. Tex. Apr. 20, 2015) (Costa, J.).  "For traditional arbitrary-and-capricious review, however, any use of extra records should be quite limited, such as to help the court gain a better understanding of the often technical subject matter at issue." *Id.* (citing *Davis Mountains*, 249 F.Supp.2d at 776).

The Court finds that the administrative record is not overly technical, such that I/K/I's proffered evidence is necessary to comprehend it.  For example, the Cammarata Declaration, (Dkt. No. 43-1 at 38–50), which discusses purported effects of Enbridge's project to seagrasses, is not any less technical, or helpful to the Court's understanding of the subject matter, than the copious and comprehensive discussion of potential effects to

seagrasses in the administrative record. *See, e.g.*, AR000003–4, AR000029–55, AR000108–124, AR000363, AR000366, AR00140–142. The Cammarata Declaration is not materially different from what is already in the record. It analyzes the administrative record.

In the same vein, the letters from Patrick Nye and the slides attached to them, (Dkt. No. 43-1 at 82–116), also do not add to or aid the Court's understanding of technical material in the administrative record. The Nye letters were either untimely or reiterate points that Nye already made during the notice-and-comment period. *Compare* AR000337–362 *and* AR000642–659 *with* (Dkt. No. 43-1 at 82–117). As with the Cammarata declaration, the Nye letters and their attachments are not admissible under the second *Medina* situation.

The purpose of the second *Medina* exception is to enlighten and assist the Court, not to simply add whatever may possibly be relevant to the record. To that end, a meritorious motion might have pointed out why items in the administrative record are obtuse or require significant technical expertise to understand them. The motion would have explained why guidance from extra-record evidence would aid the Court. *See, e.g., Indep. Turtle Farmers of La., Inc. v. United States*, 703 F.Supp.2d 604, 612–13 (W.D. La. 2010) (admitting publications serving as "background evidence" because the agency's action was not "adequately explained" in the administrative record). By contrast, I/K/I seek to introduce either cumulative or post notice-and-comment evidence, which is prohibited by *Vermont Yankee*. *See* 435 U.S. at 554–55, 98 S.Ct. at 1217. Therefore, the Court holds that I/K/I have not carried their burden of demonstrating that this is one of the "unusual

circumstances" in which a departure from the record rule is warranted. *See Medina*, 602 F.3d at 706.

### B. PROCEDURAL ISSUES

The Defendants' generally raise two procedural issues: waiver and forfeiture. (*See* Dkt. No. 53 at 20–23, 42–43, 46); (Dkt. No. 54 at 20–30, 31 n.3, 33, 38, 49 n.7, 66–67 n.8, 80). These issues are intertwined and impact a wide variety of the claims and arguments in this case.

With respect to waiver, the Court holds that I/K/I have waived Claims 3, 4, and 5 of their Complaint because they failed to advance them in the summary judgment stage. The Court also holds that, except for their public-interest-review and cumulative-impacts-analysis claims, I/K/I have waived their CWA claims because they were briefed in a conclusory manner at best. Last, the Court holds that I/K/I have not waived their claims related to the Corps' public-interest review under NEPA, nor their claims related to the effects of increased vessel traffic because, despite Defendants' contention, I/K/I adequately briefed those claims.

On the issue of forfeiture, the Court holds that I/K/I have procedurally forfeited NEPA claims related to an alleged increase in vessel traffic and any resulting effects of that alleged increase. The Court will address the merits of those arguments in the alternative nonetheless.

1.    **Waiver**[14]

Combined, the Federal Defendants and Enbridge argue that I/K/I have waived

three of their claims by failing to advance them beyond their Complaint as well as two

arguments in support of other claims by failing to adequately brief them.  (Dkt. No. 53 at

20–23); (Dkt. No. 54 at 49 n.7, 80).  The Federal Defendants also argue that many of I/K/I's

claims invoking the CWA are conclusory and, thus, are waived.  (Dkt. No. 53 at 42–43).

I/K/I respond to some waiver arguments, but not to others.  (*See generally* Dkt. Nos. 55,

56).  The Court will address each in turn.

"[W]aiver is the 'intentional relinquishment or abandonment of a known right.'"

*Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) (quoting *United States v. Olano*,

507 U.S. 725, 733, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993)).  Generally speaking, a

claim is waived where a party "fail[s] to pursue [a] claim beyond [the] complaint[.]"  *Black*

*v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006).

At the district-court level, a plaintiff's failure to pursue a claim can happen in a

few different procedural contexts.  *See, e.g.*, *Collins v. Noble Drilling (U.S.) LLC*, No. 4:16-

CV-02293, 2018 WL 7050254, at *2 (S.D. Tex. Dec. 19, 2018), *report and recommendation*

---

[14]    The Federal Defendants and Enbridge use the terms "waiver" and "abandonment"
interchangeably to describe claims that I/K/I allegedly failed to adequately brief in their
dispositive motion.  Courts seem to use these terms interchangeably as well.  *See United States v.*
*Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993) ("Waiver is the intentional
relinquishment *or abandonment* of a known right.") (emphasis added) (internal quotation marks
omitted); *see also United States v. Zuniga*, 860 F.3d 276, 284 n.9 (5th Cir. 2017) (noting that the Fifth
Circuit "[has] sometimes used the terms 'forfeiture' and 'waiver' interchangeably").  For clarity
and consistency, the Court will use the term waiver for Defendants' arguments briefed using the
terms "waiver" and "abandonment," and will address Defendants' "forfeiture" arguments
separately.

*adopted,* No. 4:16-CV-02293, 2019 WL 220306 (S.D. Tex. Jan. 15, 2019); *Dorosan v. Stewart,* No. 3:18-CV-00181, 2019 WL 4738790, at *7 (M.D. La. Sept. 27, 2019).  For example, if a plaintiff pleads a claim or issue in its complaint but wholly "ignore[s]" the claim or issue in his summary judgment motion, that claim or issue "may be considered waived[.]" *Collins,* 2018 WL 7050254, at *2 (citation omitted).  Additionally, waiver by not advancing a claim can occur when a plaintiff does not defend a claim included in his complaint *against* a defendant's dispositive motion.  *See, e.g., Dorosan,* 2019 WL 4738790, at *7 n.71. Waiver may also occur when a party "fail[s] to adequately brief an argument," which can occur in "numerous ways[.]"  *Rollins,* 8 F.4th at 397 n.1; *see also United States v. Charles,* 469 F.3d 402, 408 (5th Cir. 2006) (observing that an argument comprised of a "single conclusory sentence in a footnote" and supported by "no authority for the proposition" is deemed to be abandoned).

### a.    I/K/I's Counts 3, 4, and 5

First, Enbridge argues that it is entitled to summary judgment on Counts 3, 4, and 5 of I/K/I's Complaint because I/K/I have waived those claims by failing to brief them in their Motion, (Dkt. No. 52).  (Dkt. No. 54 at 49–50 n.7, 80–85).  Count 3 of I/K/I's Complaint asserts that the Corps violated NEPA and the CWA by "fail[ing] to discuss and independently evaluate the purpose and need for the expansion project[.]" (Dkt. No. 1 at 34–36).  Count 4 of I/K/I's Complaint asserts that the Corps violated NEPA and the CWA by "fail[ing] to analyze a reasonable range of alternatives to the proposed facility expansion[.]"  (*Id.* at 36–38).  And Count 5 of I/K/I's Complaint asserts that the Corps acted arbitrarily and capriciously in granting Enbridge a Section 404 permit because the

Corps "fail[ed] to impose adequate minimization measures to reduce indirect adverse impacts on seagrass and wetlands," as required under the CWA. (*Id.* at 38–42). I/K/I do not directly respond to Enbridge's waiver arguments concerning the failure to brief Counts 3, 4, and 5 of their Complaint at the summary judgment stage. (*See* Dkt. No. 56 at 4–10). The Court agrees with Enbridge.

In their Motion, I/K/I do not directly advance any arguments regarding Counts 3 and 4. (*See generally* Dkt. No. 52). Not only do I/K/I fail to directly advance these arguments, but I/K/I do not cite to any authority regarding these requirements. Here, by failing to offer, reference, or advance any arguments related to Counts 3 and 4 in their Motion, or to defend Counts 3 and 4 against allegations of waiver, I/K/I have waived those claims. *See Black*, 461 F.3d at 588 n.1; *HLT Props., LLC v. Evanston Ins. Co.*, 388 F.Supp.3d 718, 737 (W.D. Tex. 2019) ("A plaintiff abandons a claim when she does not respond to a dispositive motion's argument attacking it."). Therefore, the Court finds that summary judgment for Defendants is appropriate with respect to Counts 3 and 4 of I/K/I's Complaint.

Next, the Court concludes that I/K/I have also waived Count 5 because they failed to advance Count 5 in their summary-judgment motion. (*See* Dkt. No. 52). In Count 5, I/K/I plead that the Corps' EA violates the CWA's practicable-alternative requirement. (Dkt. No. 1 at 39). More specifically, I/K/I assert that the Corps acted arbitrarily and capriciously in granting Enbridge a Section 404 permit because the Corps "fail[ed] to impose adequate minimization measures to reduce indirect adverse impacts on seagrass and wetlands" as required under the CWA. (*Id.* at 38–42).

Neither I/K/I's Motion, (Dkt. No. 52), nor I/K/I's Response to Enbridge's Motion, (Dkt. No. 56), contain any discussion of Count 5's allegation that the Corps "failed its duty to ensure all 'appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem.'" (Dkt. No. 1 at 42) (quoting 40 C.F.R. §§ 230.10(d), 230.91(c)(2)). While I/K/I's briefs discuss the Corps' allegedly insufficient analysis of the impacts on seagrass, (*see* Dkt. No. 52 at 28–32); (Dkt. No. 56 at 13–16), neither brief advances the argument that the Corps took inadequate measures to subsequently minimize any impact on seagrass.

Additionally, while making this argument in Count 5 of their Complaint, I/K/I rely on 40 C.F.R. §§ 230.10, 230.12, 230.91, 230.93 and *Buttrey v. United States*, 690 F.2d 1170, 1180 (5th Cir. 1982). (Dkt. No. 1 at 39–40). Notably, I/K/I reference neither those C.F.R. sections nor *Buttrey* in either their Motion or their Response. (*See generally* Dkt. Nos. 52, 56). Nor does I/K/I cite to any other authority related to the CWA's practicable-alternative requirement. (*Id.*). Therefore, the Court finds that summary judgment for Defendants is appropriate with respect to Count 5 of I/K/I's Complaint.

b.   Public-Interest-Review Claim

Enbridge argues that I/K/I have waived their "public interest review claims mentioned in their Complaint but not raised in their Motion." (Dkt. No. 54 at 65). Although I/K/I's Response makes only a cursory mention of the public-benefit analysis, (Dkt. No. 56 at 12), and fails to respond to Enbridge's waiver argument, I/K/I's Motion for Summary Judgment does raise these portions of the Complaint's public-interest-

review claims. (*See* Dkt. No. 52 at 36–37). Accordingly, the Court disagrees with Enbridge.

The Court holds that I/K/I have not waived claims related to the CWA's public-interest-review requirement because I/K/I briefed those claims sufficiently in their Motion. (*See* Dkt. No. 52 at 15, 32, 36–37). First, a subsection of the "applicable law" section of I/K/I's brief discusses the CWA's public-interest requirement. (*Id.* at 15). Second, I/K/I assert that secondary impacts from seagrasses negatively affects the outcome of the CWA's public-interest requirement while citing to the correct regulation. (*Id.* at 32) (citing 33 C.F.R. § 320.4(a)). Third, and most importantly, section 10 of I/K/I's Motion asserts that the Corps' cost-benefits analysis was arbitrary and capricious while citing to the relevant regulatory provision. (*Id.* at 36–37) (33 C.F.R. § 320.4(b)(4)). Therefore, the Court holds that I/K/I have not failed to advance their CWA-related public-interest-review claims, and, thus, the claims are not waived.

### c.   Vessel-Traffic Claims

The Federal Defendants assert that I/K/I have waived their arguments that the Corps was required (and failed) to study environmental effects from an increase in vessel traffic. (Dkt. No. 53 at 20–23). The Federal Defendants assert that these claims have been waived because I/K/I's arguments "fail[] to engage with the [Corp's] scoping decision[.]" (*Id.* at 22). I/K/I argue that, although they did not directly challenge the Corps' scoping decision, they did not waive their claims related to increased vessel traffic because federal regulations require the Corps to consider indirect effects in its EA, and they have argued that the Corps' scope should have included a study of multiple

environmental effects stemming from an increase in vessel traffic.  (Dkt. No. 55 at 15–16).

The Court agrees with I/K/I.

Here, I/K/I do not expressly dedicate a portion of their briefing to the Corps'

scoping determination.  (*See generally* Dkt. No. 52).  Instead, they assert that the Corps

was required under NEPA to study certain environmental effects that I/K/I claim will

occur if Enbridge is granted its permit.  Those effects are (1) an increase in oil spills from

an increase in vessel traffic, (2) an increase in damages to seagrasses from an increase in

vessel traffic, (3) impacts to the neighboring communities from an increase in vessel

traffic, (4) cumulative-impacts from an increase in vessel traffic, and (5) climate-change

effects from an increase in vessel traffic.  (*See id.* at 20–41).  While I/K/I did not directly

address the Corps' scoping decision, I/K/I certainly did enough to avoid waiver.

Whether or not the Corps must consider those effects is governed by the Corps'

scoping decision.  *See* AR000104–106.  The regulations, 33 C.F.R. Pt. 325, App. B., govern

the Corps' scoping analysis.  *See infra* Sec. (IV)(C)(1)(a).  In short, the Corps' scoping

decision determines the extent to which the Corps is required to study certain indirect

effects in an EA.  Instead of tying their argument directly to 33 C.F.R. Pt. 325, App. B.,

I/K/I cite to caselaw and (now-outdated) regulations analyzing the definition, or

broadness, of the term "indirect effects" as used in NEPA's regulations.  (Dkt. No. 52 at

20–22, 28–32) (citing *City of Shoreacres*, 420 F.3d at 453 and 40 C.F.R. § 1508.8(b)[15] (2020)).

---

[15]  Section 1508.8 of Title 40 concerning "Effects" was removed by the July 2020
amendments, *see* 85 Fed. Reg. 43376 (2020), and did not appear in the regulations at the time of
the events in this case.  *See generally* 40 C.F.R. Pt. 1508 (2021).  The language quoted by I/K/I also
(continue)

Because both the Corps' scoping decision and the malleability of "indirect effects" control the Corps' responsibility under NEPA to consider certain indirect effects, the Court holds that I/K/I have not waived this issue.

d.    <u>Conclusory Arguments</u>

The Federal Defendants assert that "several of Plaintiffs' purported CWA claims should be rejected for failing to set forth reasoned argumentation."  (Dkt. No. 53 at 42). As an example, they assert that I/K/I's argument that the Corps violated the CWA by failing to take a "hard look" at the risk of oil spills, (Dkt. No. 52 at 20), is waived because "the 'hard look' standard arises out of NEPA alone[.]"  (Dkt. No. 53 at 42–43).  Notably, the Federal Defendants concede that I/K/I adequately raised CWA arguments as to the Corps' public-interest review and cumulative-impacts analysis.  (*Id.* at 43); (*See also* Dkt. No. 58 at 28).  Otherwise, the Federal Defendants ask the Court to "decline to consider Plaintiffs' conclusory arguments that invoke the CWA in name only."  (Dkt. No. 53 at 43). In response, I/K/I assert that their arguments rest on proper authority and that the claims were sufficiently raised in a reasoned way.  (Dkt. No. 55 at 30–32).

The Court agrees that I/K/I's claims "can be interpreted as raising two CWA arguments," which are their challenges to the Corps' public-interest-review and to the Corps' cumulative-impacts analysis.  (Dkt. No. 53 at 43).  On the other hand, I/K/I have insufficiently raised, based on conclusory allegations and lack of reasoned analysis, all other claims that purport to be under the CWA. *See Nat'l Ass'n of Gov't Emps. v. City Pub.*

---

does not appear in the current version of NEPA's regulations, as amended in 2022.  *See* 40 C.F.R. Pt. 1508 (2022).

*Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 705–06 (5th Cir. 1994) (affirming trial court's decision not to rule on plaintiff's "invocation of Title VI in their lengthy second amended complaint [which] is properly characterized as passing at best"); *see also Vaughn v. Mobil Oil Expl. & Producing Se., Inc.*, 891 F.2d 1195, 1198 (5th Cir. 1990) ("Ample authority exists that trial courts will not rule on claims—buried in pleadings—that go unpressed before the court.")

Aside from I/K/I's two properly raised CWA claims pertaining to the Corps' public-interest review and cumulative-impacts analysis, (Dkt. No. 52 at 22–36, 41–45), all other claims invoking the CWA "in name only[,]" (Dkt. No. 53 at 43), have been waived, and the Court declines to address them.

## 2.    Forfeiture

Enbridge argues that I/K/I have forfeited certain NEPA-related claims because I/K/I did not raise those issues during the notice-and-comment period.[16]  (Dkt. No. 54 at 23–30).   More specifically, Enbridge argues that I/K/I have forfeited two arguments

---

[16]    I/K/I point out that only Enbridge raises this forfeiture argument and assert that the Federal Defendants' choice not to raise this argument is "telling."  (Dkt. No. 56 at 4, 6).  I/K/I offer one case in support of their suspicion, this Court's ruling in *Texas v. United States*, which provides that "an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  524 F.Supp.3d 598, 653 (S.D. Tex. 2021) (quoting *United States v. Garner*, 767 F.2d 104, 116 (5th Cir. 1985) (internal quotation marks omitted)).  The Court does not believe that this principle is relevant here, where a private party is making a procedural argument and not a substantive argument for upholding the agency action in this case.

In reply, Enbridge argues that courts can find forfeiture even when the issue "is raised in litigation only by an intervenor and not the government."  (Dkt. No. 59 at 16).  Analogizing to a case where the Fifth Circuit was interpreting the National Labor Relations Act, the Court in that case declined "to bar review of an argument when the Intervenor, and not the Board, claimed waiver."  *Int'l Bhd. of Elec. Workers, AFL-CIO, CLC, Loc. Unions 605 & 985 v. NLRB*, 973 F.3d 451, 461 (5th Cir. 2020).  The Court is not persuaded by I/K/I's concerns regarding Enbridge's ability to raise a forfeiture argument.

related to an alleged increase in vessel traffic. (*Id.*). Those objections are that the Corps failed to analyze potential risks such as the risk of oil spills, (*id.* at 26–28), and the risk that increased vessel traffic will result in air, light, and noise pollution in the surrounding community, (*id.* at 29–30). Moreover, Enbridge asserts that even if those claims were not waived, these risks were adequately discussed in the Corps' EA given the scope of the Corps' review. (*Id.* at 30–45).

In response, I/K/I seemingly concede that, as a factual matter, no commentor expressly raised these risks during the Corps' notice-and-comment period. (*See* Dkt. No. 56 at 6–8). But I/K/I argue that, even assuming that no commentor expressly raised vessel-traffic related objections during the notice-and-comment period, the Corps was nevertheless on notice of these objections because the Corps "understood" that some comments raised vessel-traffic concerns. (*See id.* at 6–10). I/K/I state that this understanding is evident because "the Corps acknowledged the issue in its EA[.]" (*Id.* at 6–10). And I/K/I assert that the Corps' acknowledgement of the issue of vessel-traffic objections comes from the fact that the Corps "continue[s] to defend their response to concerns regarding [oil spills and] air, light, and noise pollution, by arguing that the EA adequately address[es] these concerns within the limited scope of the Corps' project review." (*Id.* at 8–10). As a result, I/K/I argue that they can still pursue their claims premised on increased vessel traffic because, for purposes of exhaustion, the Corps' acknowledgement of these risks provide evidence that "the [Corps] was on notice of the issue[.]" (*Id.* at 7). The Court agrees with Enbridge that these issues have been forfeited, but, even so, the Court will address the merits of I/K/I's claims related to these risks.

"Forfeiture results when a party fails to raise an issue at the appropriate time." *Edd Potter Coal Co., Inc. v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.*, 39 F.4th 202, 206 (4th Cir. 2022).  Those who participate in an agency's NEPA evaluation must "structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions." *Vermont Yankee*, 435 U.S. at 553, 98 S.Ct. at 1216. "Under ordinary principles of administrative law a reviewing court will not consider arguments that a party failed to raise in timely fashion before an administrative agency." *Gulf Restoration Net. v. Salazar*, 683 F.3d 158, 174–75 (5th Cir. 2012) (internal quotation marks omitted).  As a result of exhaustion requirements, "in most cases, an issue not presented to an administrative decisionmaker cannot be argued for the first time in federal court."  *Id.* at 175 (internal quotation marks omitted).  This rule does have exceptions.  *Id.*  Although "the agency bears the primary responsibility to ensure that it complies with NEPA, . . . an EA's [] flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action."  *Pub. Citizen*, 541 U.S. at 765, 124 S.Ct. at 2214.  Despite the rule's exceptions, it becomes "especially important when made mandatory by a specific statute requiring exhaustion of remedies or issues." *Gulf Restoration*, 683 F.3d at 175  (citing *Jones v. Bock,* 549 U.S. 199, 211, 127 S.Ct. 910, 918–19, 166 L.Ed.2d 798 (2007)).

NEPA is one such statute.[17]  *See Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act*, 85 Fed. Reg. 43318 (2020) ("Judicial review of NEPA compliance for agency actions can occur only under the APA, *which requires finality*." (emphasis added)).  As applied specifically to an agency's NEPA decisions, "[p]arties challenging compliance with NEPA must structure their participation to alert the agency to their position[.]"  *Gulf Coast Rod, Reel & Gun Club, Inc. v. U.S. Army Corps of Eng'rs,* 676 F. App'x 245, 251 (5th Cir. 2017) (per curiam).  This means that "[p]arties challenging an agency's compliance with NEPA must ordinarily raise relevant objections during the public comment period" unless one of two exceptions exists.  *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1048 (10th Cir. 2015) (citing *Pub. Citizen*, 541 U.S. at 764–65, 124 S.Ct. at 2214).  A commenter need not have pointed out an issue that constitutes an "obvious" flaw in the EA, nor do commentors forfeit claims brought to the agency's attention by other means.  *Id.* at 1048–51.

The first question for the Court to decide in resolving whether I/K/I have forfeited their vessel-traffic claims is whether a commentor raised the issue of either oil spills or an increased risk of air, light, and noise pollution to the neighboring community during the

___

[17]   In the context of the CWA, the Fifth Circuit has noted its precedents "in this area are admittedly in conflict."  *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1022 n.23 (5th Cir. 2019).  The Fifth Circuit in *Southwest Electric* held that similar arguments regarding failure to raise an objection during the notice-and-comment period fail because they are "foreclosed by our precedent."  *Id.*  As I/K/I's objections here arise under NEPA, and not the CWA, no conflict arises, and the Court will follow the "ordinary rule" of procedure and good administration used by the Fifth Circuit in *Gulf Restoration*.  *Gulf Restoration Net. v. Salazar*, 683 F.3d 158, 174–75 (5th Cir. 2012).  Moreover, this decision is in line with the Supreme Court's holding in *Public Citizen*, which directly examined the issue of forfeiture under NEPA and found that a forfeiture had occurred.  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764–65, 124 S.Ct. 2204, 2213–14, 159 L.Ed.2d 60 (2004).

notice and comment period.  But the Court need not take a long look at this question, as I/K/I have seemingly admitted that no commentor did.  (*See* Dkt. No. 56 at 6–8).

Instead of focusing on the issue of whether a commentor raised vessel-traffic environmental issues, most of I/K/I's briefing is dedicated to invoking the second exception to the general administrative principle requiring exhaustion—notice to the agency by other means.  (*See id.* at 7) ("The Courts have long held that the real issue for exhaustion purposes is whether the agency was on notice of the issue that is the subject of judicial review.").  Because I/K/I focus most of their briefing on whether the Corps had sufficient notice of I/K/I's NEPA claims related to vessel-traffic (and not whether the issue was raised during notice-and-comment), the Court will do the same.  *See, e.g.*, *Bostick*, 787 F.3d at 1048. ("The environmental groups concede that no commentor raised the oil-spill issue.").  No commentor raised the issues of the risk of oil spills and noise, light, and air-pollution impacts stemming from an increase in vessel traffic during the Corps' notice-and-comment period.

The second question the court must determine in considering whether I/K/I have forfeited their vessel-traffic claims is whether the issue was either "obvious" to the Corps or whether the Corps had independent knowledge of the risk of vessel-traffic effects.  A recent Tenth Circuit case is helpful in making this determination.  *See id.*

In *Bostick*, the plaintiffs sued seeking to invalidate a Corps-issued Section 404 permit for the construction of the southern portion of the Keystone XL Pipeline.  *Id.* at 1050.  The plaintiffs claimed that the Corps had violated NEPA for failing to consider the risk of oil spills from the pipeline's operation.  *Id.* at 1048–50.  Before reaching the merits

of their NEPA challenge, the *Bostick* parties disputed whether the plaintiffs had forfeited their NEPA arguments for failing to raise them during the notice-and-comment period. *Id.* The *Bostick* plaintiffs argued that under the first exception to the general rule, their claim related to the risk of oil spills had not been forfeited because it was "obvious" and should have been included in the EA. *Id.* Moreover, they also invoked the second exception arguing that the claim was not forfeited because the risk was otherwise brought to the Corps' attention, and they had independent knowledge of the risk. *Id.* at 1050–51. The Tenth Circuit held that, given the limited scope of activities actually authorized under the permit, neither exception applied—the EA contained no obvious flaw and no independent knowledge existed to otherwise put the Corps on notice regarding the issue. *Id.*

In reaching this conclusion, the Tenth Circuit rejected the plaintiff's argument that, in determining obviousness, the court should look to effects from the Keystone Pipeline's *operation* rather than to effects "from the activities authorized under the . . . permit (construction, maintenance, and repair of utility lines)[.]" *Id.* at 1050. Instead, the Tenth Circuit found that "[b]ecause the Corps ordinarily confined its [EAs] to impacts from the activities authorized" under the permit, "rather than the eventual operation of these utility lines, the risk of oil spills would not have alerted the Corps to an obvious deficiency in its [EA]." *Id.* at 1050. The Tenth Circuit rejected the notion that the Corps had any duty to broaden the scope of its EA to include the impact of activities beyond those directly authorized by the Section 404 permit. *Id.*

With respect to the independent knowledge exception—precluding forfeiture when an issue is otherwise brought to the agency's attention—the Tenth Circuit rejected the plaintiff's argument that an EIS performed by a separate agency provided independent knowledge to the Corps of the risk of oil spills from the Keystone Pipeline's operation. *Id.* at 1050–51. The Tenth Circuit held that, while it is true that another agency examined the risk of oil spills in a different NEPA document "as the domain of [that] separate agency," this doesn't suggest "that the Corps had any responsibility to address the risk of oil spills." *Id.* at 1050. Even assuming that the Corps knew that issuance of the permit "could lead to installation of oil pipelines, which in turn could create environmental risks from oil spills[,]" the Tenth Circuit questioned whether that knowledge would "have mattered to the Corps" because that "risk [fell] within another agency's responsibility." *Id.* Ultimately, despite the existence of information that might have been available to the Corps involving an issue outside the scope of their EA, "there would have been little reason for the Corps to consider oil spills in its [EA]." *Id.* at 1050–51.

For these reasons, the Court holds that I/K/I forfeited any claims related to oil spills or an increase in noise, light, and air-pollution. As in *Bostick*, neither of the exceptions to the general rule of exhaustion apply to relieve I/K/I of their duty to bring their objections to the Corps during the notice-and-comment period. No obvious deficiency exists in the EA's review of the risks associated with the actual permitted activity, and even if the Corps had independent knowledge of the alleged risks, they adequately discussed the relevant risks within the limited scope of the EA.

a.    Oil Spills

I/K/I assert that two sentences included in the EA are sufficient to conclude that the Corps was otherwise on notice of the risk of oil spills from an increase in vessel traffic. (Dkt. No. 56 at 7).  The first is one of Enbridge's responses to a recommendation made by IOBCWA during the notice-and-comment period.  AR000124.  In that comment, Enbridge noted that "[c]onstruction of a breakwater . . . does not contain an oil spill[.]"  *Id.*  This statement may show that the Corps was aware that, as a result of the permit, operations could pose a risk of oil spills (which they found would not be alleviated by further construction of a breakwater), but it does not indicate that the risk of oil spills would result from the *activity permitted* by the Corps.  The second sentence comes from the Corps' review of Enbridge's responses to comments during the notice-and-comment period.  *See* AR000126.  In that review, the Corps stated that "[p]otential detrimental effects due to this project, such as oil spills, have been evaluated in our General Interest review and found to be of negligible, or less, concern (See Section 7.1)."  *Id.*  Further undercutting I/K/I's argument, this statement indicates that the Corps did, in fact, examine the risk of oil spills as a result of the permitted construction and found that risk to be minimal.  It does not, however, prove that the Corps knew of or had any duty to examine such a risk resulting from *later operations* at Moda, an issue that "fall[s] within another agency's responsibility."  *See Bostick*, 787 F.3d at 1050.

Additionally, neither sentence demonstrates an obvious flaw or deficiency in the EA.  On the contrary, they show that the Corps' discussion did not omit such risks.  *See id.* at 1048–49 ("To qualify for this exception, the [plaintiffs] must show that *the omission*

49

*of any discussion* of oil-spill risks entailed an obvious flaw in the [EA]." (emphasis added)).

Neither sentence indicates that the Corps was responsible for considering operational

risks, given the limited scope of the permit.  In both of Enbridge's responses, Enbridge

considered the risk of oil spills from the specific activity of dredging, filling, and

construction and not an increase in the risk of oil spills from an increase in vessel traffic.

This scoping decision was discussed by the Corps in Section 7.1 of its EA.  And under this

scoping decision, the Corps considers only the effects limited to its "specific activity" of

dredging, filling, and construction-related activities.  (Dkt. No. 54 at 30–39).

Thus, this situation is identical to *Bostock,* which stated that "[t]he [plaintiffs] must

show that the assessment for the construction, maintenance and repair of utility lines

contained an obvious flaw, not that the agency failed to discuss impacts of an obvious

risk associated with certain activity" such as "the risks from the utility lines' operations

as well as their construction."  *Bostick*, 787 F.3d at 1049 (citation omitted).  So too here,

I/K/I cannot point to a sentence about oil spills and assume the Corps was on notice and

responsible for risks associated with operational activity outside of their authority, such

as the risks of oil spills or localized air, light, and noise pollution stemming from the day-

to-day operations of a completed MODA Terminal.  The Corps' responsibility was to

study effects from dredging, filling, and construction-related activities.

Therefore, the Court finds that I/K/I forfeited their ability to raise NEPA claims

due to a risk of oil spills associated with increased vessel traffic as a result of the permitted

construction because "no commentor suggested that the Corps had any responsibility to

address [these] risks," and I/K/I have not shown that the EA's discussion of these risks

within the Corps' authority is flawed or deficient. Notwithstanding, the Court, in the alternative, will address the merits of I/K/I's claims related to the risk of oil spills due to an increase in vessel traffic.

b. <u>Noise, Light, and Air Pollution</u>

The same analysis applies to I/K/I's argument that the anticipated increase in vessel traffic would also result in an increase in noise, light, and air pollution. I/K/I once again imply that no commentor directly raised these concerns during the notice-and-comment period. (*See* Dkt. No. 56 at 9). And for the same reasons just discussed regarding the risk of oil spills, I/K/I offer two sentences in the EA as evidence that the Corps was on notice of an environmental concern of an increase in noise, light, and air-pollution effects in neighboring communities. (*Id.*) First, the EA notes that "the applicant will utilize all [Best Management Practices] to reduce light and sound" affecting the surrounding community. AR000124. Next, the EA states that "[a]pproximately 38 comments regarding different pollution concerns (air, water, light, noise) were received." AR000139.

These statements do not evince an obvious deficiency in the EA, nor do they indicate that the Corps was on notice of an effect within its domain of authority. In the EA, the Corps limited these effects to dredging, filling, and construction-related activities in its scoping section. *See* AR000105. And because of this scoping section, the Corps understood and discussed these effects to the extent they were within the sphere of dredging, filling, and construction—not vessel traffic resulting from Moda's operations. Therefore, the Court holds that I/K/I forfeited their ability to raise NEPA claims related

51

to an increase in noise, light, and air pollution in neighboring communities stemming from an increase in vessel traffic because the EA's discussion contains no obvious flaw or deficiency and I/K/I have not shown that the Corps was on notice of, or responsible for, such an effect.   But again, the Court will address below the merits of both of I/K/I's arguments related to the effects of increased vessel traffic in the alternative.   *See Gulfstream Prop. & Cas. Ins. Co.*, 2022 WL 1541290, at *2 n.1; *Gulf Coast Rod, Reel & Gun Club, Inc.*, 676 F. App'x at 248 n.3.

      C.    MERITS ISSUES

          1.    **NEPA**

The Parties dispute whether the Corps violated NEPA.   (*See generally* Dkt. Nos. 52, 53, 54).   I/K/I assert that the Corps' EA violated NEPA in seven ways.   (*See* Dkt. No. 52 at 20–46).   First, I/K/I argue that the Corps failed to take a hard look—or any look—at the risk of oil spills and other accidents resulting from an expanded Moda Terminal.   (*Id.* at 20–22).   Second, I/K/I argue that the Corps failed to assess direct, cumulative, and secondary impacts to seagrasses from current and expanded operations at the Moda Terminal.   (*Id.* at 22–32).   Third, I/K/I argue that the Corps failed to assess the impacts to neighboring communities of noise, light, and air pollution from an increase in vessel traffic as a result of expanded operations at the Moda terminal.   (*Id.* at 32–36).   Fourth, I/K/I argue that the Corps asserting that benefits of the expansion outweigh the risks without hard data or analysis.   (*Id.* at 36–37).   Fifth, I/K/I argue that the Corps failed to analyze how expanded operations at the Moda Terminal will impact global climate change.   (*Id.* at 38–41).   Sixth, I/K/I argue that the Corps failed to consider cumulative

impacts of past and reasonably foreseeable future activities resulting from an expansion to the Moda Terminal.  (*Id.* at 41–45).  And seventh, I/K/I argue that the Corps violated NEPA by failing to prepare an EIS.  (*Id.* at 45–46).

Many of I/K/I's arguments have significant overlap, so for the sake of efficiency, the Court will address them in three subsections of this opinion.  For example, I/K/I's first, second, third, and fifth arguments each discuss whether the Corps has a responsibility under NEPA to study certain day-to-day operational effects from an expanded Moda Terminal.  (*See id.* at 20–22, 22–32, 32–36, 38–41).  Accordingly, the Court will address those arguments together in the "Scoping" section of this opinion.

After analyzing the Corps' scoping determination, the Court will discuss, in tandem, two of I/K/I's remaining NEPA arguments: whether the Corps failed to consider the cumulative impacts of activities resulting from its permit, (*id.* at 41–45), and whether the Corps' decision not to publish an EIS violated NEPA and was, thus, not in accordance with law under the APA, (*id.* at 45–46).  These issues will be discussed in the "Cumulative-Impacts Analysis Under NEPA" and "EIS" sections of this opinion, respectively.

At that point, only one of I/K/I's NEPA arguments will remain.  That is the fourth claim: whether the Corps violated the APA by acting arbitrarily and capriciously under NEPA by asserting, without data or analysis, that benefits of the expansion outweigh the risks.  (*Id.* at 36–37).  This claim will be analyzed in the "public-interest-review-analysis" portion of the CWA section.  *See infra* Sec. (IV)(C)(2)(a).

a.    <u>Scoping</u>

The Parties dispute the requisite breadth of the Corps' scoping decision. I/K/I contend that the Corps is required to consider the various operational effects[18] of the Moda Terminal once the authorized expansion is complete. (Dkt. No. 52 at 20–41). By contrast, the Federal Defendants and Enbridge argue that the Corps need not consider the Moda Terminal's downstream operational effects in its EA because the Corps' scoping decision properly limits its study of effects to those stemming from the Corps' "specific activity" requiring a permit from the Corps, which is dredging, filling, and construction-related activities surrounding the Moda Terminal. (Dkt. No. 53 at 20–23); (Dkt. No. 54 at 30–59). The Court agrees with the Defendants.

As it pertains to the issue of "scoping," NEPA "does not specify how an agency should determine the scope of its NEPA analysis." *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 194 (4th Cir. 2009). Instead, the Corps' scoping decision is a "delicate choice and one that should be entrusted to the expertise of the deciding agency." *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 962 (9th Cir. 2003). And, ultimately, the Corps' scoping decision and determination as to the scope of its EA "is entitled to substantial deference[.]" *Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698,

---

18    The operational effects are (1) an increased risk of oil spills and vessel accidents resulting from an increase in vessel traffic as the result of an expanded Moda Terminal; (2) impacts to seagrasses resulting from an increase in vessel traffic as the result of an expanded Moda Terminal; (3) an increase in noise, light, and air pollution in the surrounding community resulting from an increase in vessel traffic as the result of an expanded Moda Terminal; and (4) an increase in global greenhouse gas emissions resulting from an increase in vessel traffic as the result of an expanded Moda Terminal. (Dkt. No. 52 at 20–22, 22–32, 32–36, 38–41).

708 (6th Cir. 2014) (noting that "the question of the proper scope of analysis in the [EA]

entails interpretation of the Corps' own regulations").

The regulations provide guidance to the Corps in determining the breadth of

analysis for its scoping decisions. *See* 33 C.F.R. Pt. 325, App. B, § 7; *see also* 85 Fed.

Reg. 43323 (2020) (explaining that under the new regulations "the format for an EA is

flexible" enabling agencies "to make coordinated but independent evaluation[s] of the

environmental issues and assume responsibility for the scope and content of the EA"); 40

C.F.R. § 1501.9 (2021) (codifying the scoping requirements for an EIS under NEPA).

Under these regulations, the Corps' NEPA review must "address the impacts of the

*specific activity* requiring a [Department of the Army] permit[.]" 33 C.F.R. Pt. 325, App. B,

§ 7(b)(1) (emphasis added). The "specific activity requiring" a permit is one where "the

district engineer has sufficient control and responsibility to warrant Federal review." *Id.*

> The district engineer is considered to have control and
> responsibility for portions of the project beyond the limits of
> Corps jurisdiction where the Federal involvement is sufficient
> to turn an essentially private action into a Federal action.
> These are cases *where the environmental consequences of the
> larger project are essentially products of the Corps permit action*.

*Id.* § 7(b)(2) (emphasis added). To determine whether the district engineer has sufficient

"control and responsibility," the regulations include a four-factor test:

> (i) Whether or not the regulated activity comprises "merely a
> link" in a corridor type project (e.g., a transportation or utility
> transmission project).
>
> (ii) Whether there are aspects of the upland facility in the
> immediate vicinity of the regulated activity which affect the
> location and configuration of the regulated activity.

(iii) The extent to which the entire project will be within Corps jurisdiction.

(iv) The extent of cumulative Federal control and responsibility.

*Id.* Courts across the country have narrowly interpreted the "specific activity" the Corps engaged in when granting a Section 404 permit to dredging, filling, and construction-related activities. *Aracoma Coal Co.*, 556 F.3d at 194–95; *see also Kentuckians for the Commonwealth*, 746 F.3d at 707 ("The specific activity that is the subject of the permit is only the dredging and filling of jurisdictional waters."); *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288, 1294 (11th Cir. 2019) ("[T]he Corps' action is the issuance of a Section 404 permit authorizing the discharge of dredged and fill material into United States waters."). And because they narrowly interpret the Corps' "specific activity" to dredging, filling, and construction-related activities, courts decline to impose obligations to consider effects outside of those activities. *See e.g.*, *Red Lake*, ____ F.Supp.3d. at ____, 2022 WL 5434208, at *9 (holding that "the scope identified by the Corps was appropriate in light of the activities authorized" and rejecting the argument that the Corps was required under NEPA to study ongoing operational effects); *Residents for Sane Trash Sols., Inc. v. U.S. Army Corps of Eng'rs*, 31 F.Supp.3d 571, 588–90 (S.D.N.Y. 2014) (upholding the Corps' determination that "it did not have sufficient control and responsibility over post-construction operations to warrant an expanded review beyond the specific activity requiring the permit").

For example, in *Ohio Valley Environmental Coalition v. Aracoma Coal Co.*, the Aracoma Coal Company sought to expand its surface coal mining operations in West

Virginia. 556 F.3d at 187. Accordingly, Aracoma Coal applied for four Section 404
permits, which would lead to "the creation of 23 valley fills and 23 sediment ponds"
spanning 13 miles of streams. *Id.* The Corps prepared an EA, concluded that an EIS was
unnecessary, and granted Aracoma Coal the permits. *Id.* Plaintiffs brought suit, arguing
that the permits violated NEPA and the CWA. *Id.* The district court agreed and
concluded that "the Corps acted contrary to its regulations by limiting the scope of its
NEPA analysis to the impact of the filling of jurisdictional waters and by not looking at
the larger environmental impacts of the valley fill as a whole." *Id.* at 193. But the Fourth
Circuit disagreed. *Id.* at 217. Citing to the regulations, the Fourth Circuit held that the
Corps was not required under NEPA to study the environmental consequences "over the
entire valley fill project" because the Corps does not have sufficient control and
responsibility over the entire valley fill project. *Id.* at 195. The Fourth Circuit noted that
*other* governing bodies had regulatory authority over the valley fill project, not the Corps.
*Id.* at 197 ("[Y]et it is [the West Virginia Department of Environmental Protection], and
not the Corps, that has 'control and responsibility' over all aspects of the valley fill
projects beyond the filling of jurisdictional waters."); *id.* at 194 ("All other fill activity falls
under the exclusive jurisdiction of . . . the federally approved state . . . regulatory
authority."). Other courts have narrowly interpreted the Corps' NEPA responsibilities
for similar reasons. *See, e.g., City of Shoreacres*, 420 F.3d at 450; *Kentuckians for the
Commonwealth*, 746 F.3d at 707; *Ctr. for Biological Diversity*, 941 F.3d at 1300–01. And again,
recent district court cases have declined to extend NEPA's obligations to post-
construction operational effects. *See, e.g., Red Lake*, ____ F.Supp.3d. at ____, 2022 WL

5434208, at *9 (rejecting Plaintiff's argument that the Corps, in granting a Section 404 permit, was required under NEPA to study the operational effects of the project needing a Section 404 permit); *Residents for Sane Trash Sols., Inc.*, 31 F.Supp.3d at 588–90 (same).

Here, the Corps acted neither arbitrarily nor capriciously in its scoping decision. The Corps' scoping decision for the Moda Terminal project is discussed in Section 2 of its EA. *See* AR000104–106. In this Section, the Corps properly identified the relevant scoping law, *see* AR000104 (citing 33 C.F.R. Pt. 325, App. B), and applied the four-factor test laid out in the regulations. *See* AR000105. The Corps concluded that its scope of analysis included the "specific activity" of granting a Section 404 permit to Enbridge and:

> [s]tructural improvements to the East Basin; the 491-foot bulkhead extension area along the shoreline; the structural improvements and 43-acre dredging footprint (including side slopes) in the West Basin; the Sunset Lake seagrass mitigation area, and 50-acre wooded habitat migration area along the eastern side of the facility to be preserved.

AR000105. I/K/I's argument that the Corps is required to study the operational effects of a post-expansion Moda Terminal overlooks the fact that the Corps lacks ongoing regulatory authority over the operation of the Moda Terminal. All three of I/K/I's operational effects stem from a future increase in vessel traffic resulting from the permitted activity. But these operational effects are generally "beyond the limits of Corps jurisdiction" and authority to regulate because they are activities over which the Corps lacks "control and responsibility[.]" 33 C.F.R. Pt. 325, App. B, § 7(b); *see also* 33 C.F.R. § 320.1 ("The Corps seeks to avoid unnecessary regulatory controls."); AR000139. Regulation of vessel traffic, for example, is generally within the jurisdiction of the Coast

Guard. *See* 46 U.S.C. § 2104(a); 33 C.F.R. § 1.01-1. So, at base, each of I/K/I's arguments related to a resulting increase in vessel traffic fail because the Corps has insufficient control or responsibility over those activities.

Therefore, the Court holds that the Corps did not act arbitrarily or capriciously with respect to its scoping analysis in Section 2 of its EA. As a result, the Corps need not have considered ongoing operational effects in its study of indirect effects, cumulative-impacts, or in its determination that an EIS is not warranted.

          b.     <u>Hard Look at Indirect Effects</u>

The Court turns to I/K/I's environmental objections limited to their proper scope. In other words, the Court will consider whether the Corps took the NEPA-required "hard look" at each of I/K/I's pled environmental effects, limiting them to the Corps' "specific activity" requiring the permit. Those include dredging, filling, and construction-related activities around the Moda Terminal, and not ongoing day-to-day operations from the expanded Moda Terminal. I/K/I's environmental objections consist of the risk of oil spills, the impacts to seagrass, the effects of air, light, and noise pollution to the surrounding community, and the global impacts on climate change. (*See generally* Dkt. No. 52). The Court finds that the Corps satisfied NEPA.

To satisfy NEPA's "hard look" standard, the Corps need only "discuss[] relevant factors and explain[] its decision[.]" *Atchafalaya Basinkeeper*, 894 F.3d at 698. As to what constitutes an "effect" under NEPA, the regulations define "effects" or "impacts" as "changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed

action or alternatives[.]"   40 C.F.R. § 1508.1(g) (2021).   Notably, "a 'but for' causal

relationship is insufficient to make an agency responsible for a particular effect under

NEPA and the relevant regulations."   *Pub. Citizen*, 541 U.S. at 767, 124 S.Ct. at 2215.[19]

Instead, courts are to look to "the familiar doctrine of proximate cause from tort law."   *Id.*

(quoting *Metro. Edison Co.*, 460 U.S. at 774, 103 S.Ct. at 1561) (internal quotation marks

omitted).   Additionally, "where an agency has no ability to prevent a certain effect due

to its limited statutory authority over the relevant actions, the agency cannot be

considered a legally relevant 'cause' of the effect."   *Id.* at 770, 124 S.Ct. at 2217.

First, the Corps satisfied the NEPA requirements in looking at the risks of an

increase in oil spills.   One of the Plaintiffs, IOBCWA, proposed constructing a second

breakwater "to limit harm from potential oil spills."   AR000335; *see also* AR000124.

Enbridge responded to IOBCWA's comment, stating that construction of an additional

breakwater "would likely result in increased impacts to existing seagrass beds," and that

the proposed breakwater would not be useful to contain possible oil spills.   AR000124.

Further, the TCEQ granted Enbridge a Section 401 water-quality certification in part

because of Enbridge's agreement to "employ measures to control spills of fuels,

lubricants, or any other materials to prevent them from entering a watercourse."

---

[19]   NEPA's 2020 regulations likewise embrace the Supreme Court's rejection of the "but for" test in determining causality.   40 C.F.R. § 1508.1(g)(2) (2021) ("A 'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA.").

AR000092.  For these reasons, the Corps concluded that potential oil spills resulting from the specific activity authorized were "of negligible, or less, concern."  AR000126.[20]

Second, the Corps satisfied NEPA in looking at the impacts to seagrasses.  The Corps identified the affected area: "The dredged area includes approximately 8.86 acres of submerged aquatic vegetation and 0.80 acre of estuarine wetlands that will be directly affected by dredging (0.79 acre) and bulkhead placement (0.01 acre)."  AR000143.  The Corps noted that the impacts would be "temporary" and "associated with dredging operations," and in line with "[t]en other projects with similar components to the current proposal . . . since 2005."  AR000144.  For these reasons, the Corps concluded that "[t]he applicant's proposed project will not exacerbate any of the[] concerns [to aquatic life]."  AR000144.  This analysis satisfies NEPA's "hard look" requirement.

Third, the Corps satisfied NEPA when looking at the risks of noise, light, and air pollution.  The Corps concluded that construction activities would be "short term," "temporary," "performed during daylight hours," "within normal ranges for construction equipment," and would "likely result in a negligible release of greenhouse gases into the atmosphere when compared to global greenhouse gas emissions."  AR000139.  This discussion likewise satisfies NEPA's "hard look" requirement.

In each of I/K/I's objections, the Court is not tasked with agreeing or disagreeing with the Corps' overall findings.  Under NEPA, the Court must only determine whether

---

[20]   The EA notes that while some commenters raised "concerns surrounding . . . the increased risk of oil spills that would accompany this project" after construction had been completed, these concerns were "not relevant to the proposed project's review."  AR000126.

the Corps discussed, considered, and explained the relevant factors in a satisfactory manner. *Atchafalaya Basinkeeper*, 894 F.3d at 698. The Corps has met this standard and satisfied NEPA's requirements as to each of I/K/I's pled environmental effects.

c.   Cumulative-Impacts Analysis Under NEPA

I/K/I argue that the Corps acted arbitrarily and capriciously with regard to its cumulative-impacts analysis under NEPA. (Dkt. No. 52 at 41–45). Most notably, I/K/I argue that the Corps' analysis "does not address turbidity from vessel operations and its impact on adjacent seagrass beds" and that the Corps limited its study of past and reasonably foreseeable future impacts to a ten-year total span. (*Id.* at 42, 45). The Federal Defendants and Enbridge disagree arguing that the Corps' scoping decision appropriately scopes out vessel-related impacts and the Corps' ten-year limitation is not arbitrary and capricious. (Dkt. No. 53 at 36–39); (Dkt. No. 54 at 72–76). The Court agrees with the Defendants.

As a threshold matter, the NEPA regulations in effect[21] may have altered the bounds of an agency's duty to consider cumulative impacts in its NEPA analysis. *See* 40 C.F.R. § 1508.1(g)(3) (2021) ("Cumulative impact, defined in 40 C.F.R. 1508.7 (1978), is repealed."); *see also* 85 Fed. Reg. 43344 (2020) (noting that NEPA's reference to impacts and effects "does not subdivide the term into direct, indirect, or cumulative" and that the simplified definition of effects "provid[es] clarity on the bounds of effects consistent with the Supreme Court's holding in *Public Citizen*"); 85 Fed. Reg. 43344 (2020) ("[T]he

---

[21]   *See supra* n.6.

proposed elimination of the definition of cumulative impact [intends] to focus agencies on analysis of effects *that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action*." (emphasis added)).

Unlike previously, the controlling regulations require only that EAs address those "impacts," 40 C.F.R. § 1501.5(c)(2) (2021), that are "reasonably foreseeable and have a reasonably close causal relationship to the proposed action[.]"   40 C.F.R. § 1508.1(g) (2021); *see also* 85 Fed. Reg. 43331 (2020) (explaining that the new regulations "strike references to direct, indirect, and cumulative effects," thus the "*combined discussion* should focus on those effects that are reasonably foreseeable and have a close causal relationship to the proposed action" (emphasis added)); 85 Fed. Reg. 43323 (2020) (explaining that under the new regulations "the format for an EA is flexible" enabling agencies "to make coordinated but independent evaluation[s] of the environmental issues and *assume responsibility for the scope and content of the EA*" (emphasis added)). Nevertheless, to err on the side of caution, this Court will consider the issue under the pre-2020 amendment to NEPA's regulations.

Prior to the 2020 amendments, NEPA's regulations defined "cumulative impact" as "the impact on the environment which results from the *incremental impact* of the action when added to other past, present, and reasonably foreseeable future actions." *Atchafalaya Basinkeeper,* 894 F.3d at 703 (emphasis in original) (quoting 40 C.F.R. § 1508.7 (1978)).  The Corps' conclusion is entitled to deference, and, to satisfy NEPA, there need only be a "rational connection" between the agency's conclusions and "the facts about the project[.]"  *Id.*

The Fifth Circuit's decision in *Atchafalaya Basinkeeper* is instructive to determine whether the Corps acted arbitrarily and capriciously with regards to its cumulative-effects analysis.  There, Bayou Bridge LLC received a Corps-issued Section 404 permit in order "to build a 162-mile crude oil pipeline from Lake Charles, Louisiana to terminals near St. James."  *Id.* at 695.  Plaintiffs brought suit, claiming that the Corps had acted arbitrarily and capriciously with regard to various conclusion made in its EA, including the pipeline's cumulative impact.  *Id.* at 696.  The district court agreed and preliminarily enjoined the pipeline's construction.  *Id.* at 697–98.  The Fifth Circuit reversed the district court's preliminary injunction.  *Id.* at 704.  On the merits, the Fifth Circuit held that the agency's discussion of the project's cumulative impacts was not arbitrary or capricious because "appropriate mitigation measures" had been put in place by Bayou Bridge, including "construction conditions and limitations in the permit," the "purchase of compensatory mitigation bank acreage," which sought to "offset unavoidable impacts to wetlands that would result from permit issuance," and "further monitoring if the initial mitigation proves inadequate."  *Id.* at 703–04.  The Fifth Circuit noted:

> The 408 EA specifically acknowledged past, present and reasonably foreseeable future actions, including previous pipelines, and maintained its conclusion that there would be no adverse results *from temporary discharges during this construction.*  The 404 EA states that the district commander reviewed the 408 EA before coming to a finding of no significant impact.  The 404 EA *does discuss* cumulative effects on the environment.  It concluded that "through the efforts taken to *avoid* and *minimize* effects . . . and the *mandatory implementation of a mitigation plan* . . . permit issuance will not result in substantial direct, secondary or cumulative adverse impact on the aquatic environment."

*Id.* at 703 (ellipses in original) (emphasis added).

Like in *Atchafalaya Basinkeeper*, this Court concludes that the applicant's mitigation efforts offset any cumulative impacts. Here, the Corps took note of Enbridge's compensatory-mitigation plan when discussing cumulative effects. *See* AR000142–146. Enbridge's compensatory-mitigation plan includes a "12-Step Mitigation Plan," AR000113, involving the "planting of 20 areas of seagrasses," "the construction of a breakwater" to help promote the growth of new seagrasses, and the preservation of "70 acres of Live Oak-Red Bay Woodlands containing a mosaic of pothole wetlands[.]" AR000114. The Corps considered this mitigation plan, which is further detailed in Section 8 of the EA, AR000140–142, and concluded that the "overall [cumulative] impacts . . . from past, present, and reasonably foreseeable future impacts . . . are not considered to be significant" because "[c]ompensatory mitigation will . . . offset the impacts to eliminate or minimize the . . . cumulative effects" of the project. AR000146.

The Corps' determination, which is entitled to deference, satisfies NEPA's older, more stringent, regulations implicating "the incremental impact of the action," *see Atchafalaya Basinkeeper*, 894 F.3d at 703–04 (applying 40 C.F.R. § 1508.7 (1978)). Those regulations have seen been replaced. 40 C.F.R. § 1508.1(g)(3) (2021) ("Cumulative impact, defined in 40 C.F.R. 1508.7 (1978), is repealed."). The language that remained in the regulations defined "effects that are later in time or farther removed in distance from the proposed action" simply as "[e]ffects or impacts . . . that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action[.]" *Id.* § 1508.1(g) (2021). While the EA is no longer required by regulation to be subdivided into direct,

indirect, and cumulative effects, it nonetheless extensively discusses the potential cumulative impacts resulting from challenged permit.  AR000142–146.  Accordingly, the Corps' study of effects and impacts that are "reasonably foreseeable" satisfies the NEPA regulations that govern in this case.  AR000142.

      d.    <u>EIS</u>

I/K/I argue that the Moda Terminal expansion will significantly impact the environment, and therefore the Corps' decision to not publish an EIS was arbitrary and capricious.  (Dkt. No. 52 at 45–46).  Specifically, I/K/I argue that an EIS is required based on certain factors in NEPA's regulations that demonstrate a finding of environmental significance.  (*Id.*).  They argue that because the expansion is "highly controversial" and would result in "highly uncertain" consequences "affect[ing] public health or safety," an EIS was required.  (*Id.*).  The Federal Defendants and Enbridge argue otherwise, stating that the Corps reasonably concluded that any environmental impacts were not significant, and no EIS was necessary.  (Dkt. No. 53 at 39); (Dkt. No. 54 at 76).  Defendants further argue that the Corps' decision not to publish an EIS was proper because the Corps addressed each of NEPA's guiding factors, and their determination of no significant impact is entitled to deference.  (Dkt. No. 53 at 39–42); (Dkt. No. 54 at 76–79).  The Court agrees with the Defendants.

As stated, a court's review of an agency's NEPA decision is limited.  *See Atchafalaya Basinkeeper*, 894 F.3d at 698.  "An agency's decision not to prepare an EIS can be set aside only upon a showing that it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Pub. Citizen*, 541 U.S. at 763, 124 S.Ct. at 2213

(quoting 5 U.S.C. § 706(2)(A)); *see also Atchafalaya Basinkeeper*, 894 F.3d at 698 ("[T]he Corps' NEPA obligation was limited to discussing relevant factors and explaining its decision, not to reaching conclusions that [a court] approves[.]").

NEPA requires an agency to prepare an EIS when it performs a "major Federal action[] significantly affecting the quality of the human environment[.]"  42 U.S.C. § 4332(C).[22]  But "[a]n EIS is not required for *non* major action or a major action which does not have *significant* impact on the environment." *Sabine River Auth.*, 951 F.2d at 677 (emphasis in original) (quoting *Hassell*, 636 F.2d at 1097).  To assist in making this determination, an agency can make an EA, which "is 'a rough-cut, low-budget [EIS] designed to show whether a full-fledged [EIS]—which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project—is necessary.'"  *Id.*

---

22   Pursuant to 42 U.S.C. § 4332(C), an EIS is a "detailed statement" that must "provide full and fair discussion of significant environmental impacts and shall inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1 (2021).  The statement must consider:

> (i) reasonably foreseeable environmental effects of the proposed agency action;
>
> (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;
>
> (iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and
>
> (v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.

42 U.S.C. § 4332(C).

(quoting *Cronin v. U.S. Dept. of Agriculture*, 919 F.2d 439, 443 (7th Cir. 1990)); *see also* 85

Fed. Reg. 43321 (2020) (explaining that by using EAs "agencies can focus their limited

resources on those actions that are likely to have significant effects and require [an

EIS]").[23]

NEPA's regulations provide guidelines for agencies to determine whether their

actions are "likely to have significant effects" on the environment. 40 C.F.R. § 1501.3

(2021) ("Determine the appropriate level of NEPA review."). In part, those regulations

instruct agencies to weigh the following criteria:

> (b) In considering whether the effects of the proposed action
> are significant, agencies shall analyze the potentially affected
> environment and degree of the effects of the action. Agencies
> should consider connected actions consistent with
> § 1501.9(e)(1).
>
> > (1) In considering the potentially affected
> > environment, agencies should consider, as appropriate
> > to the specific action, the affected area (national,
> > regional, or local) and its resources, such as listed
> > species and designated critical habitat under the
> > Endangered Species Act. Significance varies with the
> > setting of the proposed action. For instance, in the case
> > of a site-specific action, significance would usually
> > depend only upon the effects in the local area.
> >
> > (2) In considering the degree of the effects, agencies
> > should consider the following, as appropriate to the
> > specific action:

---

[23]   NEPA's regulations define "Environmental Assessment" as "a concise public document prepared by a Federal agency to aid an agency's compliance with the Act and support its determination of whether to prepare an environmental impact statement or a finding of no significant impact, as provided in § 1501.6 of this chapter." 40 C.F.R. § 1508.1(h) (2021). The governing NEPA regulations further detail what is required in an EA at 40 C.F.R. § 1501.5(c)(1) (2021).

(i) Both short- and long-term effects.

(ii) Both beneficial and adverse effects.

(iii) Effects on public health and safety.

(iv) Effects that would violate Federal, State, Tribal, or local law protecting the environment.

*Id.* § 1501.3(b) (2021).  With that being said, courts generally consider four components when determining whether the Corps acted arbitrarily and capriciously in concluding that its action would not significantly affect the environment.  Those are whether the Corps:

> (1) has accurately identified the relevant environmental concern, (2) has taken a hard look at the problem in preparing its [FONSI or Environmental Assessment], (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011) (alterations in original); *see also Red Lake*, ____ F.Supp.3d. at ____, 2022 WL 5434208, at *16 (applying these factors and holding that the Corps did not act arbitrarily or capriciously in determining that an oil pipeline would not significantly affect the environment).

Here, the Corps acted neither arbitrarily nor capriciously in concluding that the Moda Terminal expansion would not significantly affect the environment.  The Corps considered all four components listed in NEPA's regulations.  *See* AR000101–154.  On various negative effects, the Corps analyzed impacts on air quality, water quality, aquatic resources, noise, light, and pollution, endangered species, and more.  AR000142–146.  In

69

addition, the Corps noted that Enbridge had developed a mitigation plan to further minimize any detrimental effects from dredging, filling, or construction.  AR000140–146.  The Corps noted compliance with statutory laws, *see* AR000146–153, including the Endangered Species Act.  In sum, the Corps did not act arbitrarily or capriciously with respect to its finding of no significant impact.

### 2. CWA

The Parties also dispute whether the Corps' EA violated the CWA.  (*See generally* Dkt. Nos. 52, 53, 54).  I/K/I asserts that the Corps violated the CWA in two ways.  (Dkt. No. 52 at 36–38, 41–45).  First, I/K/I argue that the Corps' public interest review violated the CWA because the Corps arbitrarily and capriciously concluded without "hard data or analysis" that the Moda Terminal Expansion Project's benefits outweigh the risks.  (*Id.* at 36–38).  Second, I/K/I argue that the Corps violated the CWA by providing an unsatisfactory analysis that failed to document and consider the cumulative impacts of "past and reasonably foreseeable future activities."  (*Id.* at 41–45).  The Federal Defendants and Enbridge argue otherwise, asserting instead the Corps' public-interest review and cumulative-impacts analysis satisfied the requirements of the CWA.  (Dkt. No 53 at 42–46, 46–47); (Dkt. No 54 at 80–82, 72–76).  The Court agrees with the Defendants.

### a. Public-Interest-Review Analysis

I/K/I argue that the Corps violated CWA's public-interest-review requirement because the EA's public interest review overlooked costs to the public, impacts to seagrasses, effects on neighboring communities, climate change, and the risk of oil spills.

(Dkt. No. 52 at 36–37).   The Defendants argue that the EA's public-interest review, AR000137–140, satisfies the CWA's public-interest-review requirement.  (Dkt. No. 53 at 43–46); (Dkt. No. 54 at 61–65).

This Court applies the arbitrary and capricious standard to CWA claims.  *See Atchafalaya Basinkeeper*, 894 F.3d at 696.  This is a "demanding standard[,]" and "a court will uphold an agency action unless it finds it to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Id.* at 696–97 (quoting 5 U.S.C. § 706(2)(A)).  Among other things, the CWA requires that the Corps' permitting decision "be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest."  33 C.F.R. § 320.4(a)(1).  To do this, federal regulations mandate that the Corps engage in a "general balancing process," *id.*, weighing certain factors such as:

> (i) The relative extent of the public and private need for the proposed structure or work;
>
> (ii) Where there are unresolved conflicts as to resource use, the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work; and
>
> (iii) The extent and permanence of the beneficial and/or detrimental effects which the proposed structure or work is likely to have on the public and private uses to which the area is suited.

*Id.* § 320.4(a)(2)(i)-(iii).   This is a fact-specific inquiry,[24] and a permit *must* be granted unless these factors weigh against the public interest.[25]   *Id.* § 320.4(a)(1).   This determination is given deference, as "[t]he Corps has significant expertise in making this determination."   *Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 285, 129 S.Ct. 2458, 2473, 174 L.Ed.2d 193 (2009).

Here, the Corps' public-interest review is contained in Section 7 of the EA. AR000137–140.   The Corps weighed twenty-one public-interest factors.   AR000137–138. With respect to "beneficial" factors, the Corps concluded that four factors—including economics, energy needs, navigation,[26] and needs and welfare of the people—were beneficial.   *Id.*   As to "detrimental" factors, the Corps concluded that none of the twenty-one listed factors were "detrimental."   *Id.*   The Corps concluded that an overwhelming majority of the Moda Terminal Project's factors were "negligible."   *Id.*

---

[24]     The specific weight of each factor is determined by its importance and relevance to the particular proposal.   Accordingly, how important a factor is and how much consideration it deserves will vary with each proposal.   A specific factor may be given great weight on one proposal, while it may not be present or as important on another.

33 C.F.R. § 320.4(a)(3).

[25]   "[A] permit will be granted unless the district engineer determines that it would be contrary to the public interest."   *Id.* § 320.4(a)(1).

[26]   Table 11, AR000137–138, lists three beneficial factors: economics, energy needs, and needs and welfare of the people. However, in the subsequent discussion, AR000138–140, the Corps lists an extra beneficial factor—navigation.   AR000138 ("The proposed work would improve navigation along La Quinta Channel as the proposed work will enhance navigational access to the to the site.").   Table 11 lists "navigation" as a "negligible" effect, but it seems that in the discussion, the Corps concluded that "navigation" would be a "beneficial" effect.   The Court takes the discussion section as being more probative to the determination of whether "navigation" is a beneficial or "negligible" effect than Table 11's listing.   As a result, the Court finds that the Corps concluded that there are four beneficial effects to the Project instead of the three beneficial effects that Table 11 lists.

And beyond just tallying the beneficial, detrimental, mitigated, or neutral factors, the EA includes an in-depth discussion of certain public-interest factors. AR000138–140. In this section, the Corps responds to comments concerning possible impacts to cultural resources and lands, effects on wetlands, fish and wildlife, air-pollution, aesthetics, and climate change. AR000138–139. On the effect to cultural resources, the Corps concluded that "no cultural resources would be adversely affected by the proposed undertaking" because, in part, "none of the applicant's proposed plans show" that "any work" will be done "in the adjacent uplands," which was "the object of these commenters' concern." AR000138. On effects to the environment, the Corps concluded that there would be a "negligible effect[] on the environment" due to "disturbances" from "construction activities," and "[a]ll of these effects would return to normal levels once the project is complete and construction activities have ceased." *Id.* On climate change, the Corps concluded that construction-related activities "likely will result in a negligible release of greenhouse gases into the atmosphere[.]" AR000139. Thus, the Corps' public-interest review was well reasoned and meets the requirements of the CWA. [27]

---

[27]   I/K/I argue that the Corps' public-interest review violates both the CWA and NEPA, (*see* Dkt. No. 52 at 36–57), so the Court addresses this claim under both Acts in the CWA section. *See supra* Sec. IV(C)(2). Because NEPA is a "a procedural statute, mandating a process rather than a result," *Sierra Club*, 38 F.3d at 796, the Fifth Circuit has interpreted NEPA's cost-benefit analysis as requiring only a "broad" and "*informal* cost-benefit analysis" that need not be "a formal monetary analysis[.]" *Sierra Club v. Sigler*, 695 F.2d 957, 978 (5th Cir. 1983) (emphasis added). By contrast, the CWA mandates a substantive requirement, *i.e.*, a "balancing process" where the permit's "benefits" must weigh against the project's "detriments." 33 C.F.R. § 320.4(a)(1).

The Court holds that, because the Corps' EA satisfied the CWA's public-interest review requirement as shown by the Fifth Circuit's most recent case examining the CWA's public-interest-review requirement, it likewise satisfies NEPA's cost-benefit requirement. *See Kentuckians for the Commonwealth*, 746 F.3d at 711–12 (holding that the Corps EA did not violate
(continue)

b.    Cumulative-Impacts Analysis

I/K/I claim that the Corps' cumulative-impacts analysis violated the CWA for two reasons.  First, I/K/I argue that the Corps' limitation of its cumulative-impacts analysis to a ten-year span (five years in the past and five years in the future) is arbitrary and capricious.  (Dkt. No. 52 at 43–44).  Second, I/K/I argue that the Corps underestimated the negative environmental effects to seagrasses in its cumulative-impacts analysis.  (*Id.* at 44–45).  The Defendants argue that the Corps' cumulative-impacts analysis was neither arbitrary nor capricious and satisfied the CWA as shown by the Fifth Circuit's decision in *Atchafalaya Basinkeeper*.  (Dkt. No. 53 at 46–47); (Dkt. No. 54 at 72–76).

The CWA's implementing regulations are contained in Part 230 of Title 40 of the C.F.R.  *See* 40 C.F.R. § 230.1 (explaining that the "these Guidelines" exist to implement the policies codified in the CWA).  The purpose provision of these regulations discusses a cumulative-effects requirement, stating that "dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern."  40 C.F.R. § 230.1(c).  While the Fifth Circuit has yet to produce a specific test for determining whether an EA has satisfied the CWA's cumulative-impacts

---

NEPA's cost-benefit analysis because it "also contains independent (albeit related) analyses required by the Clean Water Act and the Corps' own regulations" which "require a public interest review for all permit decisions").  Holding in I/K/I's favor would require holding NEPA's "procedural," "broad," and "informal cost-benefit analysis" to a higher standard than either the CWA's or the Corps' own substantive standards.

requirement, *Atchafalaya Basinkeeper* provides sufficient guidance to inform this Court's analysis.

The Court has previously discussed *Atchafalaya Basinkeeper* in resolving whether the Corps' EA satisfied NEPA's cumulative-impacts analysis, so the Court will limit its discussion of *Atchafalaya Basinkeeper* here.[28]   In *Atchafalaya Basinkeeper*, the Fifth Circuit held that "appropriate mitigation measures," including "construction conditions" and a "[plaintiff's] purchase of compensatory mitigation bank acreage" can be sufficient to satisfy the CWA's cumulative-impacts requirement.  894 F.3d at 703.  Here, Section 9 of the Corps' EA discusses cumulative impacts.  AR000142–146.  In that Section, the Corps cites relevant cumulative-impacts law and applies it to the Moda Terminal.  AR000146.  Specifically, Section 9 discusses effects to submerged aquatic vegetation, geographic scope of these effects, temporal scope of these effects, past and present actions, foreseeable future actions, and mitigation efforts.  AR000143–145.  And finally, the Corps discussed its conclusions regarding cumulative effects, stating that the cumulative effects

---

[28]     *Atchafalaya Basinkeeper* is the Fifth Circuit's most on-point case for discussing the CWA's cumulative-impacts requirement.  In *Atchafalaya Basinkeeper*, the Fifth Circuit overturned the district court's preliminary injunction.  894 F.3d at 704.  The Fifth Circuit described the lower court's preliminary injunction holding as finding that the EA violating "NEPA *and* the CWA by failing to adequately consider . . . the cumulative effects of [the] project."  *Id.* at 696 (emphasis added).  But notably, *Atchafalaya Basinkeeper*'s merits discussion of cumulative effects is limited to NEPA without mentioning the CWA.  *See id.* at 703–04.  Either the Fifth Circuit's undiscussed CWA conclusion in *Atchafalaya* is a holding, which this Court is bound to follow, or the Fifth Circuit assumed that the Corps satisfied its CWA cumulative-effects requirement without squarely deciding the issue.  Either way, the Court finds *Atchafalaya Basinkeeper* and the facts therein persuasive.  Moreover, another court in this district has previously applied NEPA's analysis to resolve similar claims made under the CWA.  *Gulf Coast Rod Reel v. Patterson*, No. 3:13-CV-00126, 2015 WL 10097622, at *9 (S.D. Tex. Dec. 4, 2015) (Costa, J.) ("Plaintiffs' CWA claims parallel their NEPA claims and thus fail for the same reasons already given."), *aff'd sub nom.*, 676 F. App'x 245 (5th Cir. 2017) (per curiam).

are either "not considered to be significant" or "offset" by the mitigation discussed in Section 8 of the EA.  AR000146.

I/K/I argue that the Corps' cumulative-effects analysis was arbitrary and capricious for two reasons.  First, I/K/I assert that the Corps inappropriately limited its cumulative-impacts analysis to a period of ten years.  (Dkt. No. 52 at 43–44).  I/K/I cite to no caselaw in support of this argument.  (*See id.*).  The Ninth Circuit's decision in *Selkirk Conservation All*, which upheld an EIS's temporal scope of three years, provides authority to the contrary.  336 F.3d at 948, 962–63 ("The selection of the [temporal] scope of a [NEPA document] is a delicate choice an done that should be entrusted to the expertise of the deciding agency.").  Bearing in mind that an EA is significantly smaller in its scope than an EIS, *Selkirk* provides sufficient authority for this Court to conclude that the Corps did not act arbitrarily or capriciously in its cumulative-effects analysis.  *Id.* at 963 ("A ten-year study may have been preferable in this case.  Or even a five-year study.  But the three-year study chosen by the Forest Service was not unreasonable.").  The Court finds that the temporal scope of the Corps' cumulative-impacts analysis is statutorily satisfactory.

Second, I/K/I argue that the Corps overlooked cumulative effects to seagrasses.  (Dkt. No. 52 at 44–45).  But the Corps weighed the effect to seagrasses in the mitigation subsection of its cumulative-impacts analysis.  AR000143–145.  The Corps reviewed Enbridge's mitigation efforts and concluded that "these mitigation strategies ensure[] that the proposed work will not contribute to an adverse cumulative effect on the aquatic functions and values of the watershed."  AR000145.  In light of the Corps' articulated

reasoning, the Court cannot conclude that the Corps acted arbitrarily and capriciously with respect to the effect to seagrasses in its cumulative-impacts analysis.

## V.   CONCLUSION

For the foregoing reasons, the Court **DENIES** I/K/I's request to supplement the record, (Dkt. No. 43).  The Court **GRANTS** the Federal Defendants' Motion for Summary Judgment, (Dkt. No. 53), and Enbridge's Motion for Summary Judgment, (Dkt. No. 54). Finally, the Court **DENIES** I/K/I's Motion for Summary Judgment, (Dkt. No. 52).

It is SO ORDERED.

Signed on July 27, 2023.

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**